[Civ. No. 12923.   Second Dist., Div. Three.   July 1, 1942.]

MARION KERBY, Appellant, v. HAL ROACH STUDIOS, INC. (a Corporation) et al., Respondents.

John J. Wilson, Wallace L. Ware, Lowell L. Dryden and Joseph Doyle for Appellant.

Mitchell, Silberberg, Roth & Knupp for Respondents.

SHAW, J. pro tem.—The plaintiff appeals from a judgment of nonsuit. No question is raised regarding the sufficiency of the complaint to present her case; hence we do not review its allegations.

The salient facts shown by the evidence are as follows: The plaintiff is an actress, concert singer, and monologist of many years' experience, both in the United States and Europe. For many years she has been and now is engaged in collecting American folk-lore, including legends, stories and songs, and in presenting them to the public on concert programs. Her character is conceded to be good. Defendant corporation is engaged in the business of producing motion pictures and defendant Seltzer is the head of its publicity department. In March, 1939, a motion picture which the corporation had produced was on exhibition in Los Angeles in the theater mentioned in the letter hereinafter set forth. For the purpose of advertising that picture the defendants caused a letter bearing plaintiff's name as apparent signer to be prepared, handwritten in a feminine hand and then reproduced mechanically on pink stationery, and also caused 1,000 copies of the letter so reproduced to be enclosed in pink envelopes, addressed in a feminine hand and sent by mail to 1,000 men householders selected by the mailing agency which addressed the envelopes. The date of mailing was March 8, 1939. All of this was done without plaintiff's knowledge or consent. The letter so sent reads as follows:

"Dearest:

"Don't breathe it to a soul, but I'm back in Los Angeles and more curious than ever to see you. Remember how I cut up about a year ago? Well, I'm raring to go again, and believe me I'm in the mood for fun.

"Let's renew our *aq*uaintanceship and I promise you an

evening you won't forget. Meet me in front of Warners Downtown Theatre at 7th and Hill on Thursday. Just look for a girl with a gleam in her eye, a smile on her lips and mischief on her mind!

> "Fondly,
>
> "Your ectoplasmic playmate,
>
> "Marion Kerby."

At the time this letter was sent plaintiff was a resident of Los Angeles. At that time and during all of the year 1939 her name and address were listed in the Los Angeles City Directory and in the Los Angeles telephone directory, and she was the only person of that name so listed. The name at the end of this letter, in addition to being that of plaintiff, was also the name of the chief character in two works of fiction previously published and of the chief feminine character in the moving picture above mentioned.

The effects of the sending of this letter in the manner and to the persons above described are not depicted in the record except by an excluded offer of proof and a showing that plaintiff had a large number of telephone calls and a personal visit in regard to it; but no evidence and little imagination and knowledge of human nature are necessary to enable anyone to understand what results should be expected. It could not but lead to misunderstandings between husbands and their wives who saw the letter and put the worst interpretation on it; it would arouse the expectations of lonesome males who were interested in the promised evening; and it must result in telephone calls and other communications from both irate wives and lonesome males and perhaps also from aggrieved but innocent husbands. It would also necessarily affect adversely the reputation of plaintiff with all who might read the letter and suppose her capable of writing and sending it. Apparently the defendants had no foresight in these matters, but they cannot for that reason escape the natural and probable consequences of their acts. The effect of all this on plaintiff does appear; she became terribly excited, nervous, unhappy; she had a feeling of disgrace and anguish; she was heartsick and didn't care what happened, whether she had the rest of a career or not; in the case of a lady caller plaintiff was afraid of being shot. Whereas she had fifteen paid engagements in the twelve months immediately preceding the publication, she had only two in seventeen

months thereafter, but the evidence does not certainly show that this was due to the sending of the letter.

Does the law refuse all redress to one who has been thus grievously imposed upon and subjected to embarrassment, humiliation and scorn, merely to satisfy the desire of some business concern for publicity? We think not. Plaintiff rests her appeal here for redress upon her right of privacy and we think it may be so supported. The law regarding privacy is of somewhat recent development. In some states the right of privacy is not yet recognized as a justiciable right. But in California it has been accepted as a right the breach of which gives rise to a cause of action. (*Melvin* v. *Reid*, (1931) 112 Cal. App. 285 [297 Pac. 91], where the law on this subject is quite fully discussed.) The case at bar differs in its facts from that just cited and from any other to which our attention has been called in which the right of privacy has been recognized and enforced, but that fact does not necessarily require us to hold that plaintiff has no right of action here. New sets of facts are continually arising to which accepted legal principles must be applied, and the novelty of the factual situation is not an unscalable barrier to such application of the law. ■ As stated in *Melvin* v. *Reid, supra,* quoting from another case, "The right of privacy has been defined as the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short it is the right to be let alone." The court further said in *Melvin* v. *Reid*: "The right to pursue and obtain happiness is guaranteed to all by the fundamental law of our state. This right by its very nature includes the right to live free from the unwarranted attack of others upon one's liberty, property, and reputation. Any person living a life of rectitude has that right to happiness which includes a freedom from unnecessary attacks on his character, social standing or reputation."

■ Here the plaintiff was, without her consent, plucked from her regular routine of life and thrust before the world, or at least 1,000 of its persons, as the author of a letter not written by her and of a nature to at least cast doubt on her moral character, and this was done in a manner to call down on her a train of highly undesirable consequences. This constituted as strong an invasion of the right of privacy as any of those described in the cases. As stated in *Pavesich* v. *New England Life Ins. Co.,* (1905) 122 Ga. 190 [50 S. E. 68, 106 Am. St. Rep. 104, 126, 2 Ann. Cas. 561, 69 L. R. A. 101, 113], the right of privacy includes protection against "mortifying no-

toriety,'' unless some legal justification for its infliction exists. The desire to advertise a business constitutes no such justification. A similar question was involved in *Goodyear Tire & Rubber Co.* v. *Vandergriff,* (1936) 52 Ga. App. 662 [184 S. E. 452, 454]. There the respondent, Vandergriff, who was engaged in the trucking business and seems to have been a large user of tires, sued the Goodyear Tire & Rubber Company and several of its employees, and the defendants appealed from a judgment against them. One of the individual appellants telephoned to several tire dealers who were competitors of the Goodyear Company, falsely represented to them that the respondent, Vandergriff, was talking and thus obtained from these competitors the confidential prices they would have quoted to Vandergriff. Another of the appellants then telephoned to one of these competitors, objecting to the lowness of the prices so quoted, and falsely informed this competitor that Vandergriff had revealed the prices quoted to him by the competitor. The competitors sent representatives to call on Vandergriff because of the statement that he was in the market for tires, and he was also subjected to embarrassment, chagrin, contempt and ridicule because of this conduct of appellants. On these facts it was held that Vandergriff had a cause of action. While the decision was partly based on a statute forbidding false personation, the court also held that there was an actionable invasion of Vandergriff's right of privacy, citing and following *Pavesich* v. *New England Life Ins. Co., supra,* and saying in this connection: ''. . . placing the plaintiff in the position of having procured confidential prices on tires, and then betrayed the confidence reposed in him by giving the quoted prices to competitors, had 'a tendency to bring the plaintiff into contempt or ridicule' and 'entitles him to recover, without proof of special damage.' ''

In *Melvin* v. *Reid,* (1931) *supra,* 112 Cal. App. 285 [297 Pac. 91], are listed certain qualifications and limitations of the right of privacy, but the present case does not come within any of them. The plaintiff's position as an actress and concert singer might have afforded justification for some sorts of publicity regarding her greater than that to which persons not so engaged must submit, but it in no wise justified the acts done by the defendants here.

Respondent contends that there is ''nothing salacious, suggestive or immoral about the letter.'' Without going that far,

a letter written and circulated as was this one might invade the right of privacy, but we cannot accede to this contention in all respects. To understand the full scope of the imputations made by the sending of the letter we must bear in mind all the circumstances of its sending. Plaintiff's name was signed at the end of it and this constituted an assertion that she had written it. It was handwritten in a feminine hand and on such stationery as women use in private correspondence, thus negativing any idea that it was a matter of business or anything but a personal communication to the addressee. It was sent to 1,000 male householders selected by the mailing agency. It may reasonably be inferred that many of these householders would be married and that few, if any, of them would have a personal acquaintance with plaintiff. The letter itself is of somewhat doubtful implications. While it does not directly assert or invite an improper relation between the writer and the person of the opposite sex to whom it is addressed, no great amount of imagination is necessary to read such a meaning into it, and it is easy to see how the wife of an addressee, if she saw the letter, might have done so. But apart from this, and giving the letter the most innocent meaning its words will reasonably bear, no modest woman of fine feelings and sensibilities would write such a letter as this to men whom she did not know. To suggest that a woman has written such a letter under such circumstances is to impute to her a laxness of character, a coarseness of moral fibre and a willingness to scrape acquaintance for no good purpose; and to spread such imputations abroad, as defendants have done, is as much an invasion of the right of privacy as was the publication of true but derogatory statements in *Melvin* v. *Reid*, (1931) *supra*, 112 Cal. App. 285 [297 Pac. 91].

Defendants also contend that the letter "is plainly an advertisement and should have been so regarded by any reasonable person," advancing in support of this contention the claim that it was printed and that it fixed no time for the meeting proposed. The exact method by which the letter was reproduced does not appear, but the evidence does show that it was first typewritten, then handwritten by a woman clerk, and that the longhand letter was turned over to an engraving plant by which an engraved plate was made. ▮ It is a matter of judicial notice that by such methods prints can be made which, in the absence of close inspection, will pass for original

handwriting, and we cannot assume that this letter was obviously a printed one. There is nothing in its words to refer to the motion picture or to warn any reader that it was merely an advertisement or other work of fiction. As to the rendezvous, the letter proposed that it be in the evening "on Thursday." The recipient would easily understand this to mean the next Thursday after receipt of the letter, and this would not be so vague as to make it obvious that frustration would meet any attempt to keep the appointment.

As already indicated, the letter was circulated by defendants for the purpose of advertising a moving picture, and as far as appears they had no intent to refer therein to plaintiff and did not know of her existence, although they might easily have discovered it. These facts, which are stressed by defendants, tend to show want of malice and might avert an award of punitive damages, but they constitute no defense to plaintiff's action. The letter did, in fact, refer to plaintiff in clear and definite fashion, and would reasonably have been so understood by anyone who knew of her existence. The wrong complained of is the invasion of plaintiff's right of privacy, and such an invasion is no less real or damaging because the invader supposed he was in other territory. The case bears considerable analogy, both as to the right invaded and the nature of the injury inflicted, to one of libel. It is well established that inadvertence or mistake affords no defense to a charge of libel, where the defamatory publication does, in fact, refer to the plaintiff. (*Davis* v. *Hearst,* (1911) 160 Cal. 143, 155 [116 Pac. 530]; *Taylor* v. *Hearst,* (1895) 107 Cal. 262, 270 [40 Pac. 392]; Restatement, Torts, §§ 564, 579, and comment; *Peck* v. *Tribune Co.,* (1909) 214 U. S. 185 [29 S. Ct. 554, 53 L. Ed. 960]; *Corrigan* v. *Bobbs - Merrill Co.,* (1920) 228 N. Y. 58, 63 [126 N. E. 260, 10 A. L. R. 662, 666].) "The question is not so much who was aimed at, as who was hit." (*Corrigan* v. *Bobbs-Merrill Co., supra.*)

The letter complained of here might very well have formed the basis of a charge of libel. It appears to come fully within the definition of libel in section 45 of the Civil Code. A libel need not be a statement directly referring to a person and stating something defamatory about him. It may as well be accomplished by falsely putting words into the mouth or attaching them to the pen of the person defamed and thus imputing to such person a willingness to use them, where the mere fact of having uttered or used the words would pro-

214

duce any of the results enumerated in section 45, *supra*. (*Karjavainean* v. *MacFadden Publications*, (1940) 305 Mass. 573 [26 N. E. (2d) 538]; *Ben-Oliel* v. *Press Pub. Co.*, (1929) 251 N. Y. 250 [167 N. E. 432, 434]; *Gershwin* v. *Ethical Pub. Co.*, (1937) 166 Misc. 39 [1 N. Y. S. (2d) 904]; *D'Altomonte* v. *New York Herald Co.*, (1913) 154 App. Div. 453 [139 N. Y. Supp. 200, 202] approved on this point in (1913) 208 N. Y. 596 [102 N. E. 1101].)

We do not, however, rest our decision on the ground of libel, for several reasons. The appellant has not sought to uphold her action as one for libel, and the complaint, while possibly sufficient to charge a libel, is not so labeled and was obviously not drawn for that purpose. The record does not show whether or not plaintiff complied with the statute (Stats. 1871-2 p. 533; Deering's Gen. Laws, 1937, Act 4317) requiring a bond for costs to be filed in an action for libel or slander, but the facts above recited imbue us with a strong suspicion that she did not; and if such be the case her action, if for libel, would be subject to dismissal on its return to the lower court, unless such bond were filed. (*Williams* v. *Superior Court*, (1935) 7 Cal. App. (2d) 436 [45 P. (2d) 1027]; *Bried* v. *Superior Court*, (1938) 11 Cal. (2d) 351, 354 [79 P. (2d) 1091].)

The judgment is reversed.

Schauer, P. J., and Shinn, J., concurred.

A petition for a rehearing was denied July 27, 1942, and respondents' petition for a hearing by the Supreme Court was denied August 27, 1942. Gibson, C. J., and Edmonds, J., voted for a hearing.