MASSON *v.* NEW YORKER MAGAZINE, INC., ET AL.

No. 89–1799.   Argued January 14, 1991—Decided June 20, 1991

498

*Charles O. Morgan, Jr.*, argued the cause for petitioner. With him on the briefs was *Paul Richard Kleven.*

*H. Bartow Farr III* argued the cause for respondents. With him on the brief were *Paul M. Smith, Richard G. Taranto, Charles W. Kenady*, and *Karl Olson.**

JUSTICE KENNEDY delivered the opinion of the Court.

In this libel case, a public figure claims he was defamed by an author who, with full knowledge of the inaccuracy, used quotation marks to attribute to him comments he had not made. The First Amendment protects authors and journalists who write about public figures by requiring a plaintiff to prove that the defamatory statements were made with what we have called "actual malice," a term of art denoting deliberate or reckless falsification. We consider in this opinion whether the attributed quotations had the degree of falsity required to prove this state of mind, so that the public figure can defeat a motion for summary judgment and proceed to a trial on the merits of the defamation claim.

I

Petitioner Jeffrey Masson trained at Harvard University as a Sanskrit scholar, and in 1970 became a professor of Sanskrit & Indian Studies at the University of Toronto. He spent eight years in psychoanalytic training, and qualified as

---

*Briefs of *amici curiae* urging reversal were filed for Certain Journalists and Academics by *Stewart Abercrombie Baker* and *Michael P. McDonald;* and for the Mountain States Legal Foundation by *William Perry Pendley.*

Briefs of *amici curiae* urging affirmance were filed for the Association of American Publishers, Inc., et al. by *Robert G. Sugarman, R. Bruce Rich, Slade R. Metcalf,* and *Laura R. Handman;* for Home Box Office, Inc., et al. by *P. Cameron DeVore, Daniel M. Waggoner,* and *Ronald E. Guttman;* for the Reporters Committee for Freedom of the Press et al. by *Joseph R. Bankoff, James D. Miller, Jane E. Kirtley, J. Laurent Scharff, W. Terry Maguire, René P. Milam,* and *Bruce W. Sanford;* and for The Time Inc. Magazine Co. et al. by *Roslyn A. Mazer, Paul R. Taskier, Richard M. Schmidt, Jr., Charles S. Sims, Lee Levine, James E. Grossberg,* and *Mark Goodman.*

an analyst in 1978.    Through his professional activities, he came to know Dr. Kurt Eissler, head of the Sigmund Freud Archives, and Dr. Anna Freud, daughter of Sigmund Freud and a major psychoanalyst in her own right.    The Sigmund Freud Archives, located at Maresfield Gardens outside of London, serves as a repository for materials about Freud, including his own writings, letters, and personal library.    The materials, and the right of access to them, are of immense value to those who study Freud and his theories, life, and work.

In 1980, Eissler and Anna Freud hired petitioner as projects director of the archives.    After assuming his post, petitioner became disillusioned with Freudian psychology.    In a 1981 lecture before the Western New England Psychoanalytical Society in New Haven, Connecticut, he advanced his theories of Freud.    Soon after, the board of the archives terminated petitioner as projects director.

Respondent Janet Malcolm is an author and a contributor to respondent The New Yorker, a weekly magazine.    She contacted petitioner in 1982 regarding the possibility of an article on his relationship with the archives.    He agreed, and the two met in person and spoke by telephone in a series of interviews.    Based on the interviews and other sources, Malcolm wrote a lengthy article.    One of Malcolm's narrative devices consists of enclosing lengthy passages in quotation marks, reporting statements of Masson, Eissler, and her other subjects.

During the editorial process, Nancy Franklin, a member of the fact-checking department at The New Yorker, called petitioner to confirm some of the facts underlying the article. According to petitioner, he expressed alarm at the number of errors in the few passages Franklin discussed with him.    Petitioner contends that he asked permission to review those portions of the article which attributed quotations or information to him, but was brushed off with a never-fulfilled prom-

ise to "get back to [him]." App. 67. Franklin disputes petitioner's version of their conversation. *Id.*, at 246–247.

The New Yorker published Malcolm's piece in December 1983, as a two-part series. In 1984, with knowledge of at least petitioner's general allegation that the article contained defamatory material, respondent Alfred A. Knopf, Inc., published the entire work as a book, entitled In the Freud Archives.

Malcolm's work received complimentary reviews. But this gave little joy to Masson, for the book portrays him in a most unflattering light. According to one reviewer:

> "Masson the promising psychoanalytic scholar emerges gradually, as a grandiose egotist—mean-spirited, self-serving, full of braggadocio, impossibly arrogant and, in the end, a self-destructive fool. But it is not Janet Malcolm who calls him such: his own words reveal this psychological profile—a self-portrait offered to us through the efforts of an observer and listener who is, surely, as wise as any in the psychoanalytic profession." Coles, Freudianism Confronts Its Malcontents, Boston Globe, May 27, 1984, pp. 58, 60.

Petitioner wrote a letter to the New York Times Book Review calling the book "distorted." In response, Malcolm stated:

> "Many of [the] things Mr. Masson told me (on tape) were discreditable to him, and I felt it best not to include them. Everything I do quote Mr. Masson as saying was said by him, almost word for word. (The 'almost' refers to changes made for the sake of correct syntax.) I would be glad to play the tapes of my conversation with Mr. Masson to the editors of The Book Review whenever they have 40 or 50 short hours to spare." App. 222–223.

Petitioner brought an action for libel under California law in the United States District Court for the Northern District of California. During extensive discovery and repeated

amendments to the complaint, petitioner concentrated on various passages alleged to be defamatory, dropping some and adding others. The tape recordings of the interviews demonstrated that petitioner had, in fact, made statements substantially identical to a number of the passages, and those passages are no longer in the case. We discuss only the passages relied on by petitioner in his briefs to this Court.

Each passage before us purports to quote a statement made by petitioner during the interviews. Yet in each instance no identical statement appears in the more than 40 hours of taped interviews. Petitioner complains that Malcolm fabricated all but one passage; with respect to that passage, he claims Malcolm omitted a crucial portion, rendering the remainder misleading.

(a) *"Intellectual Gigolo."* Malcolm quoted a description by petitioner of his relationship with Eissler and Anna Freud as follows:

> " 'Then I met a rather attractive older graduate student and I had an affair with her. One day, she took me to some art event, and she was sorry afterward. She said, "Well, it is very nice sleeping with you in your room, but you're the kind of person who should never leave the room—you're just a social embarrassment anywhere else, though you do fine in your own room." And you know, in their way, if not in so many words, Eissler and Anna Freud told me the same thing. They like me well enough "in my own room." They loved to hear from me what creeps and dolts analysts are. I was like an intellectual gigolo—you get your pleasure from him, but you don't take him out in public. . . .' " In the Freud Archives 38.

The tape recordings contain the substance of petitioner's reference to his graduate student friend, App. 95, but no suggestion that Eissler or Anna Freud considered him, or that he considered himself, an " 'intellectual gigolo.' " Instead, petitioner said:

"They felt, in a sense, I was a private asset but a public liability. . . . They liked me when I was alone in their living room, and I could talk and chat and tell them the truth about things and they would tell me. But that I was, in a sense, much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with me." *Id.*, at 104.

(b) *"Sex, Women, Fun."* Malcolm quoted petitioner as describing his plans for Maresfield Gardens, which he had hoped to occupy after Anna Freud's death:

"'It was a beautiful house, but it was dark and sombre and dead. Nothing ever went on there. I was the only person who ever came. I would have renovated it, opened it up, brought it to life. Maresfield Gardens would have been a center of scholarship, but it would also have been a place of sex, women, fun. It would have been like the change in *The Wizard of Oz*, from black-and-white into color.'" In the Freud Archives 33.

The tape recordings contain a similar statement, but in place of the references to "sex, women, fun" and The Wizard of Oz, petitioner commented:

"[I]t is an incredible storehouse. I mean, the library, Freud's library alone is priceless in terms of what it contains: all his books with his annotations in them; the Schreber case annotated, that kind of thing. It's fascinating." App. 127.

Petitioner did talk, earlier in the interview, of his meeting with a London analyst:

"I like him. So, and we got on very well. That was the first time we ever met and you know, it was buddy-buddy, and we were to stay with each other and [laughs] we were going to pass women on to each other, and we were going to have a great time together when I lived in the Freud house. We'd have great parties there and we were [laughs]—

.          .          .          .          .

". . . going to really, we were going to live it up."
*Id.*, at 129.

(c) *"It Sounded Better."* Petitioner spoke with Malcolm about the history of his family, including the reasons his grandfather changed the family name from Moussaieff to Masson, and why petitioner adopted the abandoned family name as his middle name. The article contains the passage:

> " 'My father is a gem merchant who doesn't like to stay in any one place too long. His father was a gem merchant, too—a Bessarabian gem merchant, named Moussaieff, who went to Paris in the twenties and adopted the name Masson. My parents named me Jeffrey Lloyd Masson, but in 1975 I decided to change my middle name to Moussaieff—it sounded better.'" In the Freud Archives 36.

In the most similar tape-recorded statement, Masson explained at considerable length that his grandfather had changed the family name from Moussaieff to Masson when living in France, "[j]ust to hide his Jewishness." Petitioner had changed his last name back to Moussaieff, but his then-wife Terry objected that "nobody could pronounce it and nobody knew how to spell it, and it wasn't the name that she knew me by." Petitioner had changed his name to Moussaieff because he "just liked it." "[I]t was sort of part of analysis: a return to the roots, and your family tradition and so on." In the end, he had agreed with Terry that "it wasn't her name after all," and used Moussaieff as a middle instead of a last name. App. 87–89.

(d) *"I Don't Know Why I Put It In."* The article recounts part of a conversation between Malcolm and petitioner about the paper petitioner presented at his 1981 New Haven lecture:

> "[I] asked him what had happened between the time of the lecture and the present to change him from a Freud-

ian psychoanalyst with somewhat outré views into the bitter and belligerent anti-Freudian he had become.

"Masson sidestepped my question. 'You're right, there was nothing disrespectful of analysis in that paper,' he said. 'That remark about the sterility of psychoanalysis was something I tacked on at the last minute, and it was totally gratuitous. I don't know why I put it in.'" In the Freud Archives 53.

The tape recordings instead contain the following discussion of the New Haven lecture:

Masson: "So they really couldn't judge the material. And, in fact, until the last sentence I think they were quite fascinated. I think the last sentence was an in, [sic] possibly, gratuitously offensive way to end a paper to a group of analysts. Uh,—"

Malcolm: "What were the circumstances under which you put it [in]? . . ."

Masson: "That it was, was true.

     .      .      .      .      .

". . . I really believe it. I didn't believe anybody would agree with me.

     .      .      .      .      .

". . . But I felt I should say something because the paper's still well within the analytic tradition in a sense. . . .

     .      .      .      .      .

". . . It's really not a deep criticism of Freud. It contains all the material that would allow one to criticize Freud but I didn't really do it. And then I thought, I really must say one thing that I really believe, that's not going to appeal to anybody and that was the very last sentence. Because I really do believe psychoanalysis is entirely sterile . . . ." App. 176.

(e) *"Greatest Analyst Who Ever Lived."* The article contains the following self-explanatory passage:

"A few days after my return to New York, Masson, in a state of elation, telephoned me to say that Farrar, Straus & Giroux has taken *The Assault on Truth* [Masson's book]. 'Wait till it reaches the best-seller list, and watch how the analysts will crawl,' he crowed. 'They move whichever way the wind blows. They will want me back, they will say that Masson is a great scholar, a major analyst—after Freud, he's the greatest analyst who ever lived. Suddenly they'll be calling, begging, cajoling: "Please take back what you've said about our profession; our patients are quitting." They'll try a short smear campaign, then they'll try to buy me, and ultimately they'll have to shut up. Judgment will be passed by history. There is no possible refutation of this book. It's going to cause a revolution in psychoanalysis. Analysis stands or falls with me now.'" In the Freud Archives 162.

This material does not appear in the tape recordings. Petitioner did make the following statements on related topics in one of the taped interviews with Malcolm:

". . . I assure you when that book comes out, which I honestly believe is an honest book, there is nothing, you know, mean-minded about it. It's the honest fruit of research and intellectual toil. And there is not an analyst in the country who will say a single word in favor of it." App. 136.

"Talk to enough analysts and get them right down to these concrete issues and you watch how different it is from my position. It's utterly the opposite and that's finally what I realized, that I hold a position that no other analyst holds, including, alas, Freud. At first I thought: Okay, it's me and Freud against the rest of the analytic world, or me and Freud and Anna Freud and Kur[t] Eissler and Vic Calef and Brian Bird and Sam

Lipton against the rest of the world.   Not so, it's me. it's me alone."   *Id.*, at 139.

The tape of this interview also contains the following exchange between petitioner and Malcolm:

Masson: ". . . analysis stands or falls with me now."

Malcolm: "Well that's a very grandiose thing to say."

Masson: "Yeah, but it's got nothing to do with me.   It's got to do with the things I discovered."   *Id.*, at 137.

(f) *"He Had The Wrong Man."*   In discussing the archives' board meeting at which petitioner's employment was terminated, Malcolm quotes petitioner as giving the following explanation of Eissler's attempt to extract a promise of confidentiality:

" '[Eissler] was always putting moral pressure on me. "Do you want to poison Anna Freud's last days?   Have you no heart?   You're going to kill the poor old woman." I said to him, "What have I done?   *You're* doing it. *You're* firing me.   What am I supposed to do—be grateful to you?"   "You could be silent about it.   You could swallow it.   I know it is painful for you.   But you could just live with it in silence."   "Why should I do that?" "Because it is the honorable thing to do."   Well, he had the wrong man.' "   In the Freud Archives 67.

From the tape recordings, on the other hand, it appears that Malcolm deleted part of petitioner's explanation (italicized below), and petitioner argues that the "wrong man" sentence relates to something quite different from Eissler's entreaty that silence was "the honorable thing."   In the tape recording, petitioner states:

"But it was wrong of Eissler to do that, you know. He was constantly putting various kinds of moral pressure on me and, 'Do you want to poison Anna Freud's last days?   Have you no heart?'   He called me: 'Have you no heart?   You're going to kill the poor old woman.

Have you no heart? Think of what she's done for you and you are now willing to do this to her.' I said, 'What have I, what have I done? *You* did it. You fired me. What am I supposed to do: thank you? be grateful to you?' He said, 'Well you could never talk about it. You could be silent about it. You could swallow it. I know it's painful for you but just live with it in silence.' 'Fuck you,' I said, 'Why should I do that? Why? You know, why should one do that?' 'Because it's the honorable thing to do *and you will save face. And who knows? If you never speak about it and you quietly and humbly accept our judgment, who knows that in a few years if we don't bring you back?'* Well, he had the wrong man." App. 215–216.

Malcolm submitted to the District Court that not all of her discussions with petitioner were recorded on tape, in particular conversations that occurred while the two of them walked together or traveled by car, while petitioner stayed at Malcolm's home in New York, or while her tape recorder was inoperable. She claimed to have taken notes of these unrecorded sessions, which she later typed, then discarding the handwritten originals. Petitioner denied that any discussion relating to the substance of the article occurred during his stay at Malcolm's home in New York, that Malcolm took notes during any of their conversations, or that Malcolm gave any indication that her tape recorder was broken.

Respondents moved for summary judgment. The parties agreed that petitioner was a public figure and so could escape summary judgment only if the evidence in the record would permit a reasonable finder of fact, by clear and convincing evidence, to conclude that respondents published a defamatory statement with actual malice as defined by our cases. *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 255–256 (1986). The District Court analyzed each of the passages and held that the alleged inaccuracies did not raise a jury question. The court found that the allegedly fabricated quotations were either substantially true, or were "'one of a number of possi-

ble rational interpretations' of a conversation or event that 'bristled with ambiguities,'" and thus were entitled to constitutional protection. 686 F. Supp. 1396, 1399 (ND Cal. 1987) (quoting *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 512 (1984)). The court also ruled that the "he had the wrong man" passage involved an exercise of editorial judgment upon which the courts could not intrude. 686 F. Supp., at 1403–1404.

The Court of Appeals affirmed, with one judge dissenting. 895 F. 2d 1535 (CA9 1989). The court assumed for much of its opinion that Malcolm had deliberately altered each quotation not found on the tape recordings, but nevertheless held that petitioner failed to raise a jury question of actual malice, in large part for the reasons stated by the District Court. In its examination of the "intellectual gigolo" passage, the court agreed with the District Court that petitioner could not demonstrate actual malice because Malcolm had not altered the substantive content of petitioner's self-description, but went on to note that it did not consider the "intellectual gigolo" passage defamatory, as the quotation merely reported Kurt Eissler's and Anna Freud's opinions about petitioner. In any event, concluded the court, the statement would not be actionable under the "'incremental harm branch' of the 'libel-proof' doctrine," *id.*, at 1541 (quoting *Herbert* v. *Lando*, 781 F. 2d 298, 310–311 (CA2 1986)).

The dissent argued that any intentional or reckless alteration would prove actual malice, so long as a passage within quotation marks purports to be a verbatim rendition of what was said, contains material inaccuracies, and is defamatory. 895 F. 2d, at 1562–1570. We granted certiorari, 498 U. S. 808 (1990), and now reverse.

## II

### A

Under California law, "[l]ibel is a false and unprivileged publication by writing . . . which exposes any person to ha-

tred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code Ann. § 45 (West 1982). False attribution of statements to a person may constitute libel, if the falsity exposes that person to an injury comprehended by the statute. See *Selleck* v. *Globe International, Inc.*, 166 Cal. App. 3d 1123, 1132, 212 Cal. Rptr. 838, 844 (1985); *Cameron* v. *Wernick*, 251 Cal. App. 2d 890, 60 Cal. Rptr. 102 (1967); *Kerby* v. *Hal Roach Studios, Inc.*, 53 Cal. App. 2d 207, 213, 127 P. 2d 577, 581 (1942); cf. *Baker* v. *Los Angeles Herald Examiner*, 42 Cal. 3d 254, 260–261, 721 P. 2d 87, 90–91 (1986). It matters not under California law that petitioner alleges only part of the work at issue to be false. "[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text," though the California courts recognize that "[w]hile a drop of poison may be lethal, weaker poisons are sometimes diluted to the point of impotency." *Washburn* v. *Wright*, 261 Cal. App. 2d 789, 795, 68 Cal. Rptr. 224, 228 (1968).

The First Amendment limits California's libel law in various respects. When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i. e.*, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964). Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication," *St. Amant* v. *Thompson*, 390 U. S. 727, 731 (1968), or acted with a "high degree of awareness of . . . probable falsity," *Garrison* v. *Louisiana*, 379 U. S. 64, 74 (1964).

Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. See *Greenbelt Cooper-*

*ative Publishing Assn., Inc.* v. *Bresler,* 398 U. S. 6 (1970). We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. See *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U. S. 657, 666, n. 7 (1989). In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity. This definitional principle must be remembered in the case before us.

B

In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject.

A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because it attributes an untrue factual assertion to the speaker. An example would be a fabricated quotation of a public official admitting he had been convicted of a serious crime when in fact he had not.

Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold. John Lennon once was quoted as saying of

the Beatles, "We're more popular than Jesus Christ now." Time, Aug. 12, 1966, p. 38. Supposing the quotation had been a fabrication, it appears California law could permit recovery for defamation because, even without regard to the truth of the underlying assertion, false attribution of the statement could have injured his reputation. Here, in like manner, one need not determine whether petitioner is or is not the greatest analyst who ever lived in order to determine that it might have injured his reputation to be reported as having so proclaimed.

A self-condemnatory quotation may carry more force than criticism by another. It is against self-interest to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit when it happens. This principle underlies the elemental rule of evidence which permits the introduction of statements against interest, despite their hearsay character, because we assume "that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Advisory Committee's Notes on Fed. Rule Evid. 804(b)(3), 28 U. S. C. App., p. 789 (citing *Hileman* v. *Northwest Engineering Co.*, 346 F. 2d 668 (CA6 1965)).

Of course, quotations do not always convey that the speaker actually said or wrote the quoted material. "Punctuation marks, like words, have many uses. Writers often use quotation marks, yet no reasonable reader would assume that such punctuation automatically implies the truth of the quoted material." *Baker* v. *Los Angeles Examiner*, 42 Cal. 3d, at 263, 721 P. 2d, at 92. In *Baker*, a television reviewer printed a hypothetical conversation between a station vice president and writer/producer, and the court found that no reasonable reader would conclude the plaintiff in fact had made the statement attributed to him. *Id.*, at 267, 721 P. 2d, at 95. Writers often use quotations as in *Baker*, and a reader will not reasonably understand the quotations to indicate reproduction of a conversation that took place. In other

instances, an acknowledgment that the work is so-called docudrama or historical fiction, or that it recreates conversations from memory, not from recordings, might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed.

The work at issue here, however, as with much journalistic writing, provides the reader no clue that the quotations are being used as a rhetorical device or to paraphrase the speaker's actual statements. To the contrary, the work purports to be nonfiction, the result of numerous interviews. At least a trier of fact could so conclude. The work contains lengthy quotations attributed to petitioner, and neither Malcolm nor her publishers indicate to the reader that the quotations are anything but the reproduction of actual conversations. Further, the work was published in The New Yorker, a magazine which at the relevant time seemed to enjoy a reputation for scrupulous factual accuracy. These factors would, or at least could, lead a reader to take the quotations at face value. A defendant may be able to argue to the jury that quotations should be viewed by the reader as nonliteral or reconstructions, but we conclude that a trier of fact in this case could find that the reasonable reader would understand the quotations to be nearly verbatim reports of statements made by the subject.

## C

The constitutional question we must consider here is whether, in the framework of a summary judgment motion, the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity. This inquiry in turn requires us to consider the concept of falsity; for we cannot discuss the standards for knowledge or reckless disregard without some understanding of the acts required for liability. We must consider whether the requisite falsity inheres in the attribution of words to the petitioner which he did not speak.

In some sense, any alteration of a verbatim quotation is false. But writers and reporters by necessity alter what people say, at the very least to eliminate grammatical and syntactical infelicities. If every alteration constituted the falsity required to prove actual malice, the practice of journalism, which the First Amendment standard is designed to protect, would require a radical change, one inconsistent with our precedents and First Amendment principles. Petitioner concedes that this absolute definition of falsity in the quotation context is too stringent, and acknowledges that "minor changes to correct for grammar or syntax" do not amount to falsity for purposes of proving actual malice. Brief for Petitioner 18, 36–37. We agree, and must determine what, in addition to this technical falsity, proves falsity for purposes of the actual malice inquiry.

Petitioner argues that, excepting correction of grammar or syntax, publication of a quotation with knowledge that it does not contain the words the public figure used demonstrates actual malice. The author will have published the quotation with knowledge of falsity, and no more need be shown. Petitioner suggests that by invoking more forgiving standards the Court of Appeals would permit and encourage the publication of falsehoods. Petitioner believes that the intentional manufacture of quotations does not "represen[t] the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies," *Bose Corp.*, 466 U. S., at 513, and that protection of deliberate falsehoods would hinder the First Amendment values of robust and well-informed public debate by reducing the reliability of information available to the public.

We reject the idea that any alteration beyond correction of grammar or syntax by itself proves falsity in the sense relevant to determining actual malice under the First Amendment. An interviewer who writes from notes often will engage in the task of attempting a reconstruction of the speaker's statement. That author would, we may assume,

act with knowledge that at times she has attributed to her subject words other than those actually used. Under petitioner's proposed standard, an author in this situation would lack First Amendment protection if she reported as quotations the substance of a subject's derogatory statements about himself.

Even if a journalist has tape-recorded the spoken statement of a public figure, the full and exact statement will be reported in only rare circumstances. The existence of both a speaker and a reporter; the translation between two media, speech and the printed word; the addition of punctuation; and the practical necessity to edit and make intelligible a speaker's perhaps rambling comments, all make it misleading to suggest that a quotation will be reconstructed with complete accuracy. The use or absence of punctuation may distort a speaker's meaning, for example, where that meaning turns upon a speaker's emphasis of a particular word. In other cases, if a speaker makes an obvious misstatement, for example by unconscious substitution of one name for another, a journalist might alter the speaker's words but preserve his intended meaning. And conversely, an exact quotation out of context can distort meaning, although the speaker did use each reported word.

In all events, technical distinctions between correcting grammar and syntax and some greater level of alteration do not appear workable, for we can think of no method by which courts or juries would draw the line between cleaning up and other changes, except by reference to the meaning a statement conveys to a reasonable reader. To attempt narrow distinctions of this type would be an unnecessary departure from First Amendment principles of general applicability, and, just as important, a departure from the underlying purposes of the tort of libel as understood since the latter half of the 16th century. From then until now, the tort action for defamation has existed to redress injury to the plaintiff's reputation by a statement that is defamatory and false. See

*Milkovich* v. *Lorain Journal Co.*, 497 U. S. 1, 11 (1990). As we have recognized, "[t]he legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 341 (1974). If an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation.

These essential principles of defamation law accommodate the special case of inaccurate quotations without the necessity for a discrete body of jurisprudence directed to this subject alone. Last Term, in *Milkovich* v. *Lorain Journal Co.*, we refused "to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" 497 U. S., at 18 (citation omitted). We recognized that "expressions of 'opinion' may often imply an assertion of objective fact." *Ibid.* We allowed the defamation action to go forward in that case, holding that a reasonable trier of fact could find that the so-called expressions of opinion could be interpreted as including false assertions as to factual matters. So too in the case before us, we reject any special test of falsity for quotations, including one which would draw the line at correction of grammar or syntax. We conclude, rather, that the exceptions suggested by petitioner for grammatical or syntactical corrections serve to illuminate a broader principle.

The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. See Restatement (Second) of Torts § 563, Comment *c* (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 776 (5th ed. 1984). It overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot "justify every word of the alleged defamatory matter; it is sufficient if the substance of the

charge be proved true, irrespective of slight inaccuracy in the details." 5 B. Witkin, Summary of California Law § 495 (9th ed. 1988) (citing cases). In this case, of course, the burden is upon petitioner to prove falsity. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 775 (1986). The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." *Heuer* v. *Kee*, 15 Cal. App. 2d 710, 714, 59 P. 2d 1063, 1064 (1936); see also *Alioto* v. *Cowles Communications, Inc.*, 623 F. 2d 616, 619 (CA9 1980); *Maheu* v. *Hughes Tool Co.*, 569 F. 2d 459, 465–466 (CA9 1978). Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." R. Sack, Libel, Slander, and Related Problems 138 (1980); see, *e. g., Wehling* v. *Columbia Broadcasting System*, 721 F. 2d 506, 509 (CA5 1983); see generally R. Smolla, Law of Defamation § 5.08 (1991). Our definition of actual malice relies upon this historical understanding.

We conclude that a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co.* v. *Sullivan*, 376 U. S., at 279–280, and *Gertz* v. *Robert Welch, Inc., supra*, at 342, unless the alteration results in a material change in the meaning conveyed by the statement. The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case.

Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language. And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning. In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait of petitioner espe-

cially damning because so much of it appeared to be a self-portrait, told by petitioner in his own words. And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.

## D

The Court of Appeals applied a test of substantial truth which, in exposition if not in application, comports with much of the above discussion. The Court of Appeals, however, went one step beyond protection of quotations that convey the meaning of a speaker's statement with substantial accuracy and concluded that an altered quotation is protected so long as it is a "rational interpretation" of an actual statement, drawing this standard from our decisions in *Time, Inc.* v. *Pape,* 401 U. S. 279 (1971), and *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485 (1984). Application of our protection for rational interpretation in this context finds no support in general principles of defamation law or in our First Amendment jurisprudence. Neither *Time, Inc.* v. *Pape* nor *Bose Corp.* involved the fabrication of quotations, or any analogous claim, and because many of the quotations at issue might reasonably be construed to state or imply factual assertions that are both false and defamatory, we cannot accept the reasoning of the Court of Appeals on this point.

In *Time, Inc.* v. *Pape,* we reversed a libel judgment which arose out of a magazine article summarizing a report by the United States Commission on Civil Rights discussing police civil rights abuses. The article quoted the Commission's summary of the facts surrounding an incident of police brutality, but failed to include the Commission's qualification that these were allegations taken from a civil complaint. The Court noted that "the attitude of the Commission toward the factual verity of the episodes recounted was anything but straightforward," and distinguished between a "direct ac-

count of events that speak for themselves," 401 U. S., at 285, 286, and an article descriptive of what the Commission had reported. *Time, Inc.* v. *Pape* took into account the difficult choices that confront an author who departs from direct quotation and offers his own interpretation of an ambiguous source. A fair reading of our opinion is that the defendant did not publish a falsification sufficient to sustain a finding of actual malice.

In *Bose Corp.*, a Consumer Reports reviewer had attempted to describe in words the experience of listening to music through a pair of loudspeakers, and we concluded that the result was not an assessment of events that speak for themselves, but "'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." 466 U. S., at 512 (quoting *Time, Inc.* v. *Pape, supra*, at 290). We refused to permit recovery for choice of language which, though perhaps reflecting a misconception, represented "the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies." 466 U. S., at 513.

The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources. Where, however, a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said. This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves." *Time, Inc.* v. *Pape, supra*, at 285. More accurately, the quotation allows the subject to speak for himself.

The significance of the quotations at issue, absent any qualification, is to inform us that we are reading the state-

ment of petitioner, not Malcolm's rational interpretation of what petitioner has said or thought. Were we to assess quotations under a rational interpretation standard, we would give journalists the freedom to place statements in their subjects' mouths without fear of liability. By eliminating any method of distinguishing between the statements of the subject and the interpretation of the author, we would diminish to a great degree the trustworthiness of the printed word and eliminate the real meaning of quotations. Not only public figures but the press doubtless would suffer under such a rule. Newsworthy figures might become more wary of journalists, knowing that any comment could be transmuted and attributed to the subject, so long as some bounds of rational interpretation were not exceeded. We would ill serve the values of the First Amendment if we were to grant near absolute, constitutional protection for such a practice. We doubt the suggestion that as a general rule readers will assume that direct quotations are but a rational interpretation of the speaker's words, and we decline to adopt any such presumption in determining the permissible interpretations of the quotations in question here.

## III

### A

We apply these principles to the case before us. On summary judgment, we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S., at 255. So we must assume, except where otherwise evidenced by the transcripts of the tape recordings, that petitioner is correct in denying that he made the statements attributed to him by Malcolm, and that Malcolm reported with knowledge or reckless disregard of the differences between what petitioner said and what was quoted.

Respondents argue that, in determining whether petitioner has shown sufficient falsification to survive summary judgment, we should consider not only the tape-recorded statements but also Malcolm's typewritten notes. We must decline that suggestion. To begin with, petitioner affirms in an affidavit that he did not make the complained of statements. The record contains substantial additional evidence, moreover, evidence which, in a light most favorable to petitioner, would support a jury determination under a clear and convincing standard that Malcolm deliberately or recklessly altered the quotations.

First, many of the challenged passages resemble quotations that appear on the tapes, except for the addition or alteration of certain phrases, giving rise to a reasonable inference that the statements have been altered. Second, Malcolm had the tapes in her possession and was not working under a tight deadline. Unlike a case involving hot news, Malcolm cannot complain that she lacked the practical ability to compare the tapes with her work in progress. Third, Malcolm represented to the editor in chief of The New Yorker that all the quotations were from the tape recordings. Fourth, Malcolm's explanations of the time and place of unrecorded conversations during which petitioner allegedly made some of the quoted statements have not been consistent in all respects. Fifth, petitioner suggests that the progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration. Malcolm contests petitioner's allegations, and only a trial on the merits will resolve the factual dispute. But at this stage, the evidence creates a jury question whether Malcolm published the statements with knowledge or reckless disregard of the alterations.

B

We must determine whether the published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity.

(a) *"Intellectual Gigolo."* We agree with the dissenting opinion in the Court of Appeals that "[f]airly read, intellectual gigolo suggests someone who forsakes intellectual integrity in exchange for pecuniary or other gain." 895 F. 2d, at 1551. A reasonable jury could find a material difference between the meaning of this passage and petitioner's tape-recorded statement that he was considered "much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with [him]."

The Court of Appeals majority found it difficult to perceive how the "intellectual gigolo" quotation was defamatory, a determination supported not by any citation to California law, but only by the argument that the passage appears to be a report of Eissler's and Anna Freud's opinions of petitioner. *Id.*, at 1541. We agree with the Court of Appeals that the most natural interpretation of this quotation is not an admission that petitioner considers himself an intellectual gigolo but a statement that Eissler and Anna Freud considered him so. It does not follow, though, that the statement is harmless. Petitioner is entitled to argue that the passage should be analyzed as if Malcolm had reported falsely that *Eissler* had given this assessment (with the added level of complexity that the quotation purports to represent petitioner's understanding of Eissler's view). An admission that two well-respected senior colleagues considered one an "intellectual gigolo" could be as, or more, damaging than a similar self-appraisal. In all events, whether the "intellectual gigolo" quotation is defamatory is a question of California law. To the extent that the Court of Appeals based its conclusion in the First Amendment, it was mistaken.

The Court of Appeals relied upon the "incremental harm" doctrine as an alternative basis for its decision. As the court explained it: "This doctrine measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication." *Ibid.;* see generally Note, 98 Harv. L.

Rev. 1909 (1985); R. Smolla, Law of Defamation § 9.10[4][d] (1991). The court ruled, as a matter of law, that "[g]iven the . . . many provocative, bombastic statements indisputably made by Masson and quoted by Malcolm, the additional harm caused by the 'intellectual gigolo' quote was nominal or non-existent, rendering the defamation claim as to this quote non-actionable." 895 F. 2d, at 1541.

This reasoning requires a court to conclude that, in fact, a plaintiff made the other quoted statements, cf. *Liberty Lobby, Inc.* v. *Anderson,* 241 U. S. App. D. C. 246, 251, 746 F. 2d 1563, 1568 (1984), vacated and remanded on other grounds, 477 U. S. 242 (1986), and then to undertake a factual inquiry into the reputational damage caused by the remainder of the publication. As noted by the dissent in the Court of Appeals, the most "provocative, bombastic statements" quoted by Malcolm are those complained of by petitioner, and so this would not seem an appropriate application of the incremental harm doctrine. 895 F. 2d, at 1566.

Furthermore, the Court of Appeals provided no indication whether it considered the incremental harm doctrine to be grounded in California law or the First Amendment. Here, we reject any suggestion that the incremental harm doctrine is compelled as a matter of First Amendment protection for speech. The question of incremental harm does not bear upon whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not. As a question of state law, on the other hand, we are given no indication that California accepts this doctrine, though it remains free to do so. Of course, state tort law doctrines of injury, causation, and damages calculation might allow a defendant to press the argument that the statements did not result in any incremental harm to a plaintiff's reputation.

(b) *"Sex, Women, Fun."* This passage presents a closer question. The "sex, women, fun" quotation offers a very different picture of petitioner's plans for Maresfield Gardens

than his remark that "Freud's library alone is priceless." See *supra*, at 503. Petitioner's other tape-recorded remarks did indicate that he and another analyst planned to have great parties at the Freud house and, in a context that may not even refer to Freud house activities, to "pass women on to each other." We cannot conclude as a matter of law that these remarks bear the same substantial meaning as the quoted passage's suggestion that petitioner would make the Freud house a place of "sex, women, fun."

(c) *"It Sounded Better."* We agree with the District Court and the Court of Appeals that any difference between petitioner's tape-recorded statement that he "just liked" the name Moussaieff, and the quotation that "it sounded better" is, in context, immaterial. Although Malcolm did not include all of petitioner's lengthy explanation of his name change, she did convey the gist of that explanation: Petitioner took his abandoned family name as his middle name. We agree with the Court of Appeals that the words attributed to petitioner did not materially alter the meaning of his statement.

(d) *"I Don't Know Why I Put It In."* Malcolm quotes petitioner as saying that he "tacked on at the last minute" a "totally gratuitous" remark about the "sterility of psychoanalysis" in an academic paper, and that he did so for no particular reason. In the tape recordings, petitioner does admit that the remark was "possibly [a] gratuitously offensive way to end a paper to a group of analysts," but when asked why he included the remark, he answered "[because] it was true . . . I really believe it." Malcolm's version contains material differences from petitioner's statement, and it is conceivable that the alteration results in a statement that could injure a scholar's reputation.

(e) *"Greatest Analyst Who Ever Lived."* While petitioner did, on numerous occasions, predict that his theories would do irreparable damage to the practice of psychoanalysis, and did suggest that no other analyst shared his views, no tape-recorded statement appears to contain the substance or the

arrogant and unprofessional tone apparent in this quotation. A material difference exists between the quotation and the tape-recorded statements, and a jury could find that the difference exposed petitioner to contempt, ridicule, or obloquy.

(f) *"He Had The Wrong Man."* The quoted version makes it appear as if petitioner rejected a plea to remain in stoic silence and do "the honorable thing." The tape-recorded version indicates that petitioner rejected a plea supported by far more varied motives: Eissler told petitioner that not only would silence be "the honorable thing," but petitioner would "save face," and might be rewarded for that silence with eventual reinstatement. Petitioner described himself as willing to undergo a scandal in order to shine the light of publicity upon the actions of the Freud Archives, while Malcolm would have petitioner describe himself as a person who was "the wrong man" to do "the honorable thing." This difference is material, a jury might find it defamatory, and, for the reasons we have given, there is evidence to support a finding of deliberate or reckless falsification.

## C

Because of the Court of Appeals' disposition with respect to Malcolm, it did not have occasion to address petitioner's argument that the District Court erred in granting summary judgment to The New Yorker Magazine, Inc., and Alfred A. Knopf, Inc., on the basis of their respective relations with Malcolm or the lack of any independent actual malice. These questions are best addressed in the first instance on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I join Parts I, II–A, II–D, and III–A, but cannot wholly agree with the remainder of the opinion. My principal dis-

agreement is with the holding, *ante*, at 517, that "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity . . . unless the alteration results in a material change in the meaning conveyed by the statement."

Under *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), "malice" means deliberate falsehood or reckless disregard for whether the fact asserted is true or false. *Id.,* at 279–280. As the Court recognizes, the use of quotation marks in reporting what a person said asserts that the person spoke the words as quoted. As this case comes to us, it is to be judged on the basis that in the instances identified by the Court, the reporter, Malcolm, wrote that Masson said certain things that she knew Masson did not say. By any definition of the term, this was "knowing falsehood": Malcolm asserts that Masson said these very words, knowing that he did not. The issue, as the Court recognizes, is whether Masson spoke the words attributed to him, not whether the fact, if any, asserted by the attributed words is true or false. In my view, we need to go no further to conclude that the defendants in this case were not entitled to summary judgment on the issue of malice with respect to any of the six erroneous quotations.

That there was at least an issue for the jury to decide on the question of deliberate or reckless falsehood does not mean that plaintiffs were necessarily entitled to go to trial. If, as a matter of law, reasonable jurors could not conclude that attributing to Masson certain words that he did not say amounted to libel under California law, *i. e.*, "expose[d] [Masson] to hatred, contempt, ridicule, or obloquy, or which cause[d] him to be shunned or avoided, or which ha[d] a tendency to injure him in his occupation," Cal. Civ. Code Ann. § 45 (West 1982), a motion for summary judgment on this ground would be justified.* I would suppose, for example,

---

*In dealing with the "intellectual gigolo" passage, the Court of Appeals ruled that there was no malice but in the alternative went on to say that as a matter of law the erroneous attribution was not actionable defamation. 895 F. 2d 1535, 1540–1541 (CA9 1989).

that if Malcolm wrote that Masson said that he wore contact lenses, when he said nothing about his eyes or his vision, the trial judge would grant summary judgment for the defendants and dismiss the case. The same would be true if Masson had said "I was spoiled as a child by my Mother," whereas, Malcolm reports that he said "I was spoiled as a child by my parents." But if reasonable jurors could conclude that the deliberate misquotation was libelous, the case should go to the jury.

This seems to me to be the straightforward, traditional approach to deal with this case. Instead, the Court states that deliberate misquotation does not amount to *New York Times* malice unless it results in a material change in the meaning conveyed by the statement. This ignores the fact that, under *New York Times*, reporting a known falsehood— here the knowingly false attribution—is sufficient proof of malice. The falsehood, apparently, must be substantial; the reporter may lie a little, but not too much.

This standard is not only a less manageable one than the traditional approach, but it also assigns to the courts issues that are for the jury to decide. For a court to ask whether a misquotation substantially alters the meaning of spoken words in a defamatory manner is a far different inquiry from whether reasonable jurors could find that the misquotation was different enough to be libelous. In the one case, the court is measuring the difference from its own point of view; in the other it is asking how the jury would or could view the erroneous attribution.

The Court attempts to justify its holding in several ways, none of which is persuasive. First, it observes that an interviewer who takes notes of any interview will attempt to reconstruct what the speaker said and will often knowingly attribute to the subject words that were not used by the speaker. *Ante*, at 514–515. But this is nothing more than an assertion that authors may misrepresent because they cannot remember what the speaker actually said. This

should be no dilemma for such authors, for they could report their story without purporting to quote when they are not sure, thereby leaving the reader to trust or doubt the author rather than believing that the subject actually said what he is claimed to have said. Moreover, this basis for the Court's rule has no application where there is a tape of the interview and the author is in no way at a loss to know what the speaker actually said. Second, the Court speculates that even with the benefit of a recording, the author will find it necessary at times to reconstruct, *ante*, at 515, but again, in those cases why should the author be free to put his or her reconstruction in quotation marks, rather than report without them? Third, the Court suggests that misquotations that do not materially alter the meaning inflict no injury to reputation that is compensable as defamation. *Ante*, at 517. This may be true, but this is a question of defamation or not, and has nothing to do with whether the author deliberately put within quotation marks and attributed to the speaker words that the author knew the speaker did not utter.

As I see it, the defendants' motion for summary judgment based on lack of malice should not have been granted on any of the six quotations considered by the Court in Part III–B of its opinion. I therefore dissent from the result reached with respect to the *"It Sounded Better"* quotation dealt with in paragraph (c) of Part III–B, but agree with the Court's judgment on the other five misquotations.