White, J.
Plaintiff brought suit against defendants claiming that he was defamed by statements made in Lets Go: Egypt and Israel, a travel guide created by Harvard Student Agencies and published by St. Martin’s Press (collectively referred to hereafter as “defendants”). Defendants moved for summary judgment. Plaintiff opposed, in part relying on the Motion to Strike. For reasons set forth more fully below, (1) plaintiffs motion to strike is allowed in part and denied in part, and (2) defendants’ motion for summary judgment is denied.
I. MOTION TO STRIKE BACKGROUND
During the discovery phase of this litigation, defendants sought to obtain documents pertaining to plaintiff, the owner and manager of a youth hostel in Jerusalem, from the files of various Israeli government agencies. In August of 1994, defendants moved pursuant to the International Hague Convention for the issuance of letters of request by the Court to the Central Authority in Israel for the production of documents from the Israeli Police, the Municipality of Jerusalem, the Ministry of the Interior and the Ministry of Tourism regarding plaintiff. Defendants’ motion was allowed on October 3, 1994.
Realizing that production of documents pursuant to the Hague Convention would take several months, defendants pursued an alternative avenue to discovery. Silber & Schottenfels, defendants’ local counsel in Israel, requested documents directly from the Israeli authorities listed above. In November of 1994, the Israeli Police and Jerusalem Municipality allowed *624 counsel to examine and copy documents pertaining to plaintiff from their files.
Pursuant to the Hague Convention request, the Jerusalem Magistrates Court issued orders to the aforementioned agencies for the production of documents. In January of 1995, each agency, with the exception of the Ministry of Interior, produced documents to Silber & Schottenfels. Each document production was accompanied by an affidavit of the producing agency authenticating the copies produced as true copies of documents kept in that agency’s files. Silber & Schottenfels forwarded the documents and affidavits to the Israeli Centred Authority which, in turn, forwarded them to the Court. All of the documents produced by the Jerusalem Municipality, and many of the documents produced by the Israeli Police, were among those that had previously been turned over voluntarily to defendants’ local counsel in November of 1994.
Defendants’ motion for summary judgment was accompanied by an imposing collection of affidavits and exhibits. As many of the exhibits were in Hebrew, translations were necessary. Therefore, defendants’ submission included affidavits from four professional translators, to which were attached copies of the Hebrew originals and English translations. Also included was an affidavit from Joel Silber, an attorney with Silber and Schottenfels, who coordinated defendants’ discovery efforts in Israel. Finally, defendants’ submission included an affidavit from John Lankenau, chief counsel for defendants, comprised mostly of exhibits already attached to the translators’ affidavits. Although the submission by defendants contained some duplication of documents, this was apparently done to afford the Court convenient access to the documents supporting the motion.
DISCUSSION
In his motion, plaintiff asserts standard objections to the affidavits (i.e. affiants not competent to testify to the matters asserted in the affidavit; statements not made from affiant’s own personal knowledge). More specifically, plaintiff challenges the exhibits obtained from Israeli government agencies on the ground that they were not properly authenticated pursuant to Mass.R.Civ.P. 44(a)(2). The Court determines that there is no merit to plaintiffs general objections and therefore will concern itself only with plaintiffs challenge to the authenticity of the exhibits.
Plaintiff contends that the documents submitted by defendants are inadmissible because they were not properly authenticated pursuant to Mass.R.Civ.P. 44(a)(2). Rule 44(a)(2) provides, in part, that a copy of a foreign official record is admissible when “attested by a person authorized to make the attestation, and accompanied by a final certification as to the genuineness of the signature and official position (i) of the attesting person ...” The Rule further provides that “final certification may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent of the United States . . .” Here, Silber certified the genuineness of the signatures and positions of the attestors from the Israeli Police, Jerusalem Municipality and Ministry of Tourism. His certification was in turn certified by the American Counsel in Israel. While, technically, the genuineness of the attestor’s signature and position must be certified by an official attached to the U.S. embassy or consulate, the Court determines that the procedure employed by defendants comported with the spirit of Rule 44(a)(2). Moreover, the fact that the documents were produced pursuant to the Hague Convention provides the guarantees of genuineness required under Rule 44(a)(2).
Although plaintiff went to great lengths to specifically object to each and every exhibit and affidavit,[2] the Court is able to summarily dispose of most of plaintiffs requests for relief. Plaintiffs motion is denied with respect to all exhibits and affidavits except the following:
(1) Lankenau Affidavit, Exhibit 10: This exhibit should be stricken because it was not included in the Hague Convention production and therefore has not been properly authenticated. Neither Lankenau nor Silber (the document is also attached as Exhibit F to Silber’s affidavit) is competent to attest to the source, authenticity or veracity of Exhibit 10.
(2) Peretz Affidavit, Exhibits A and B: These exhibits should be stricken because they were not part of the Hague Convention production and therefore have not been properly authenticated. Neither Per-etz nor Lankenau (exhibit A also appears as Exhibit 40 to the Lankenau affidavit) is competent to testify to the source, authenticity or veracity of Exhibits A and B.
(3) Elgrod Affidavit, Exhibit A: This exhibit should be stricken because it was not part of the Hague Convention production and therefore has not been properly authenticated. Elgrod is not competent to attest to the source, authenticity or veracity of Exhibit A.
(4) Kohn Affidavit, Exhibit J: This exhibit should be stricken because it was not part of the Hague Convention production and therefore has not been properly authenticated. Kohn is not competent to attest to the source, authenticity or veracity of Exhibit J.
As for the remaining requests which the Court denies, some comment is warranted. Plaintiff asked for, and the Court generously granted, an extension of time within which to file opposition to defendants’ motion for summary judgment. Plaintiff failed to file the opposition within the deadline as extended. Notwithstanding this failure, plaintiff proceeded to file, after the deadline, a flurry of motions in an attempt to thwart defendants’ drive for summary judgment.[3] *625 Without going into great detail, the Court feels compelled to comment that many of the arguments proffered by plaintiff in support of the Motion to Strike are frivolous, insubstantial and, most importantly, totally unhelpful to a Court already asea in documents and still at the summary judgment stage.
For example, plaintiff argues at great length that the translators’ affidavits predate the Hague Convention production. As a consequence, plaintiff asserts, the translations should be deemed inadmissible because they were not made from documents obtained through the Hague Convention process. Although plaintiff is technically correct about the date disparity, his argument ignores the simple fact that many of the documents ultimately obtained via the Hague Convention production were identical to those previously obtained by defendants directly from the Jerusalem Municipality and the Israeli police. The translations were made from documents obtained via the voluntary production. Those documents were retroactively “authenticated” when later produced pursuant to the Hague Convention request. Plaintiff suggests a conspiracy, theorizing that the documents were tampered with by defendants prior to the Hague Convention production, but offers no credible evidence in support of these bald assertions.
Plaintiff objects to the documents attached to the translators’ affidavits on another ground. Plaintiff claims that they should be stricken because the affi-ants are not qualified to attest to the truth and accuracy of the official documents. The fallacy of this argument hardly requires elaboration. The translators were not attesting to the truth and accuracy of the official documents (that function was performed by officials from the government agencies which produced the documents); rather, they were attesting to the truth and accuracy of the translations of the official documents.
The aforementioned examples are representative of the overall groundlessness of the arguments contained in plaintiffs Motion to Strike and exemplify the unhelpfulness of the bulky submission. Plaintiff would be wise to avoid such filings in the future or risk sanctions for pressing such claims.
II. MOTION FOR SUMMARY JUDGMENT BACKGROUND
A. Factual
At all times relevant to this action, plaintiff was the owner and manager of the International Youth Hostel (“IYH”) on Ussishkin Street in Jerusalem, Israel. The IYH was listed and reviewed in the 1989 and 1990 editions of Let’s Go: Egypt and Israel {“Let’s Go”). The publication was one in a series of Let’s Go budget travel guides researched and written by students under the auspices of Harvard Student Agencies, Inc. (“HSA.’j HSA is a not-for-profit corporation comprised of various agencies run by full-time students of Harvard College.
In the 1989 edition of Let’s Go, the entry concerning the IYH read, in part, as follows:
Women should not stay here, nor should men who don’t want to encourage harassment. The manager, Itzik, was being sued on sexual harassment charges by 3 different women during the summer of 1988. Don’t let the beautiful neighborhood and calm exterior fool you. If management changes, this could be a great hostel; it’s worth checking. But avoid Itzik (short, dark-skinned, smelling heavily of cologne) at all costs.
The 1989 entry was researched and written by Deborah Benor, a Harvard undergraduate, during the summer of 1988. When Benor arrived at the IYH, she recognized plaintiff as someone with whom she had an unpleasant encounter during a previous stay in Jerusalem. Benor did not speak with plaintiff or any guests at the IYH. Rather, the information upon which Benor relied in writing the entry about the IYH was obtained during a visit to the Edison Youth Hostel. Upon mentioning the IYH to the owner of the Edison, Maria Blumfield, Benor was told that numerous complaints of sexual harassment had been lodged against plaintiff during the preceding months. In fact, according to Blumfield, several women had sought refuge at the Edison after fleeing from plaintiff and the IYH. Blumfield put Benor in touch with two guests at the Edison who confirmed the stories about plaintiff.
Benor’s entries for the 1989 guide were reviewed and edited in the fall of 1988. The official version of the guide was released in the beginning of November 1988.
As a matter of fact, statements accusing plaintiff of sexual harassment had been submitted to Israeli police during and prior to the summer of 1988. In a September 8, 1987 statement to police, Kathleen Spence, a married American tourist, described the following encounter with plaintiff:
He called me into his bedroom and hugged me with more than a friendly hug or a thank you hug. He grabbed me around the waist and pressed me to his body and kissed me on my neck until I broke loose from him . . . Last night . . . about fifteen minutes after I got into bed, Itzik the manager approached me. -I pretended to be asleep and he came closer to my bed and called my name. I pretended as if he just woke me up, and he asked me whether I was warm enough or if I needed more blankets. At the same time he put his hand on my left breast and kept his hand on me for about ten seconds. Then he put both his hands on my face and while holding my face kissed my face and lips. He held my face tightly and I couldn’t move much.
Sometime in June or July of 1988,[4] Maria Schoe-man, a South African tourist who worked at the IYH, filed a complaint with police which attributed the following acts to plaintiff:
*626 When I hung up the telephone, I saw that Itzik locked the door. He asked me to sit down. I wanted to leave. He asked me again to sit down. I sat down on the bed. He asked me why I was going out, and that I was tired from the entire day and that I had to rest, and I was making sure to bring people to the Hostel. I told him that I was [illegible] in order to go out, and that my private life did not disturb the work. Then he started to touch me. He caught hold of my shoulders, hugged me and tried to push me into bed, while kissing [Translator’s note: unclear, might also be “biting”] me on the neck and on the face (distorts her face in disgust). I pushed him off of my body, I stood up and I told him angrily: do not touch me, and leave me alone.
Finally, Venetia Butler, a Canadian tourist who also had worked at the IYH, submitted a statement to police which detailed the following encounter with plaintiff:
I went to my room to sleep. I fell asleep in my bed, while I was dressed. Itzik woke me [illegible] awhile after I left. He asked me to come sleep near him. He gave me brandy and vodka to drink [illegible] I was sleeping already. I could not stand him anymore, so I drank it and fell asleep on the bed, next to him. I woke up an hour later, at about [illegible, may be 3:00 a.m.]. I felt him trying to put his penis into my mouth. I threw him off of me. His legs were close to my [not clear, probably cheeks]. I did not feel that his penis was on my lips.
No formal charges were ever brought against plaintiff based on Spence, Schoeman and Butler’s statements. According to the police chief of Jerusalem, formal action was not pursued either because of insufficient evidence or the fact that all three women had left the country.
The 1990 edition of Let’s Go included an entry for the IYH which warned:
Lei’s Go strongly recommends that travelers DO NOT stay here. Don’t let the beautiful neighborhood and calm exterior fool you. If management changes, this could be a great hostel; check at the tourist office.
The 1990 entry was researched and written by Joel Kurtzberg, a Harvard undergraduate, during the summer of 1989. For most of his research on the IYH, Kurtzberg consulted with Benor, the latter having attained the position of editor for the 1990 edition. Kurtzberg visited the IYH and was told by two women staying there that the hostel was closed. Eventually, Kurtzberg spoke to plaintiff, who told Kurtzberg that the hostel was closed and ordered the former to leave.
The original version of the 1990 entry contained the statement from the 1989 guide about charges of sexual harassment being filed against plaintiff. During the editing and review process, that information was deleted.
Prior to and during the period when the Let’s Go guides were being researched and published, plaintiff applied for a business license to operate the IYH. In 1987, plaintiffs application was vehemently opposed by Orthodox residents of the neighborhood who felt that the activities and clientele at a hostel would be a disturbance and an insult to their way of life and the upbringing of their children. In early 1989, after the 1989 guide had been published, plaintiff encountered increased community opposition to his license application. At public hearings, residents and business owners in the neighborhood voiced their opposition to plaintiffs application. Many participants cited the charges of sexual harassment which had been filed against plaintiff. In numerous newspaper articles reporting the licensing battle, the entry from the 1989 guide, detailing the charges of sexual harassment, was cited. Plaintiffs application for a business license was ultimately denied.
B. Procedural
In February of 1990, plaintiff filed suit against defendants in New York state court. The New York action was based solely on the 1989 entry. Defendants moved to dismiss the claim on the ground that it was barred by New York’s one year statute of limitations for defamation actions. Plaintiff did not oppose defendants’ motion for summary judgment, but instead stated his intention to file suit in Massachusetts. Defendants’ motion to dismiss was allowed on November 9, 1990.
Plaintiff filed suit in Massachusetts on November 14, 1990, again asserting a claim based on the 1989 edition, but also adding a claim based on the 1990 edition. Defendants moved to dismiss the first count, arguing that the Full Faith and Credit Clause of the United States Constitution and principles of res judi-cata barred plaintiff from relitigating his claim based on the 1989 guide. This Court, by Izzo, J., granted defendants’ motion on November 5, 1991.
On December 16, 1991, plaintiff moved to vacate the New York court’s dismissal. The court denied plaintiffs motion on June 23, 1992, and the decision was unanimously affirmed by the Appellate Division, First Department, on March 16, 1993.
In June of 1993, defendants moved to dismiss plaintiffs claim based on the 1990 guide on the ground that the statements contained in the entry were constitutionally protected opinion. This Court, by Neel, J., denied defendants’ motion. In so doing, Judge Neel determined that the 1990 entry was “clearly opinion.” However, noting that statements of opinion are actionable if they imply that they are based on undisclosed, defamatory facts, Judge Neel held that he could not conclude that the “derogatory opinion was not based upon, and did not imply, undisclosed facts contained in the previous year’s (1989) Let’s Go review; for purposes of this motion, the latter must be presumed defamatory.”
*627 DISCUSSION
Defendants assert that they are entitled to summary judgment on four independent grounds: (1) the statements in the 1990 entry were constitutionally protected opinion; (2) the statements about plaintiff were substantially true; (3) plaintiff is a limited-purpose public figure and he cannot show that defendants acted with the requisite degree of fault; and (4) the statement was protected under the common interest privilege.
In Massachusetts, courts are encouraged to decide defamation cases at the summary judgment stage because of the potential “chill” which such lawsuits have on the exercise of First Amendment rights. King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987). Nevertheless, notwithstanding this principle, the Court determines that outstanding issues of fact preclude the entry of summary judgment here. However, the Court endeavors in this decision to significantly narrow the issues which require resolution by a finder of fact.
1. Matter of Opinion
Defendants assert that the 1990 entry contains a constitutionally protected statement of opinion that does not contain a provably false statement and does not imply the existence of undisclosed defamatory facts. The Court disagrees. Judge Neel has already found that the statements in the 1990 entry were “clearly opinion”; this Court does not disagree. Therefore the only remaining question is whether the 1990 entry implies that it was based on undisclosed, defamatory facts. “It is the function of the Court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts . . .” Pritsker v. Brudnoy, 389 Mass. 776, 779 (1983), quoting Restatement (Second) of Torts, §566, comment c. The test is whether the average reader of a statement of opinion would reasonably conclude that the opinion was based on undisclosed, defamatory facts. Id. The emphatic exhortation in the 1990 entry, “Let’s Go strongly recommends that travelers DO NOT stay here,” teems with suggestions that it is based on undisclosed, defamatory facts. In particular, the use of the term “strongly” and the use of upper case letters for “DO NOT” connotes more than opinionated emphasis; to the average reader it would suggest an underlying threatening or dangerous condition.
As an alternative argument, defendants contend that the 1990 entry does not imply the facts contained in the 1989 guide. However, it is undisputed that Kurtzberg did little independent research of the IYH for the 1990 guide, but instead relied heavily on the text of the 1989 entry and conversations with Benor. In addition, until a portion was deleted, the original draft of the 1990 entry was virtually identical to the 1989 entry. When all of these undisputed facts are considered together, the Court determines that a reasonable reader of the 1990 guide would have concluded that the statement of opinion therein was based on undisclosed defamatory facts and, further, that there is a nexus between the 1990 entry and the defamatory statements contained in the 1989 guide. For all of these reasons, defendants are not entitled to summary judgment on this theory.
2. Substantial Truth
As a general rule, a statement is not actionable as defamatory if it is true or substantially true. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516 (1991); Milgroom v. News Group Boston, Inc., 412 Mass. 9, 13 (1992); ELM Medical Lab. v. RKO General, Inc., 403 Mass. 779, 787 (1989). Under the substantial truth doctrine, “(m)inor inaccuracies do not amount to falsity so long as the substance, ‘the gist, the sting of the libelous charge be justified.’ ” Masson, 501 U.S. at 516 (citation omitted). In deciding whether a statement is substantially true, the court looks at whether the statement as written “would have a different effect on the mind of the reader from that which the pleaded truth would have produced.” Masson, 501 U.S. at 516.
With these principles in mind, the Court determines that the undisclosed factual statement upon which the 1990 entry was based, namely the statement in the 1989 entry, was substantially true. Plaintiff argues that the statement “(t]he manager, Itzik, was being sued on sexual harassment charges by 3 different women during the summer of 1988,” is a defamatory falsehood because no formal charges were brought against plaintiff by anyone during the summer of 1988. However, the gist of the statement is not that formal charges were brought against plaintiff; rather, the sting derives from the attribution to plaintiff of conduct which amounts to sexual harassment. The undisputed evidence establishes that, prior to the publication of the 1989 guide, three women, in signed and sworn statements to the police, accused plaintiff of engaging in conduct which amounted to sexual harassment, if not sexual assault. In fact, in a letter dated October 31, 1989, Naomi Weil, plaintiffs predecessor counsel, admitted that “(i]n 1988, two complaints were in fact made against Mr. Yitzchak Sha’ari with the police.”[5] As such, the statement in the 1989 entry was substantially true.
Nevertheless, a determination that the statements were substantially true does not automatically entitle defendants to summary judgment. In Massachusetts, unlike most jurisdictions, truth is not an absolute defense in libel cases. General Laws c. 231, §92 provides that in an action for libel “truth shall be a justification unless actual malice is proved.” It has been decided that §92 cannot be constitutionally applied in cases involving public figures or public officials. Materia v. Huff, 394 Mass. 328, 333 n.6 (1985). However, the Supreme Judicial Court expressly left open the question of whether §92 can be applied in suits involving private plaintiffs. Id. Therefore, *628 whether §92 precludes summary judgment in a case such as this one turns on whether plaintiff is to be treated as a private or public figure.
Where, as here, the relevant facts are not disputed, it is for the Court to determine whether plaintiff should be treated as a public or private figure. Rosenblatt v. Baer, 383 U.S. 75, 88 (1966); Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 862 (1975). Defendants claim that plaintiff should be treated as a limited purpose public figure. A limited purpose figure is one who “voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.” Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974); Jones v. Taibbi, 400 Mass. 786, 798 (1987).
Defendants contend that a storm of controversy surrounded plaintiffs operation of the IYH. Plaintiff inserted himself into the center of the controversy, defendants argue, as a direct result of his own activities, including his operation of an unlicensed place of public accommodation, his application for a license, and his alleged sexual harassment and assault of guests at his hostel. Consequently, defendants conclude, plaintiff cannot claim that he was dragged unwillingly into the public controversy.
The Court disagrees with defendants’ contention and determines that plaintiff should be treated as a private figure. The simple fact that plaintiff applied for a business license does not render him a limited purpose public figure. Accord Jones v. Himstead, 7 Media L. Rep. 2433 (Mass. Super. Ct. 1981) (plaintiff did not become a limited purpose public figure by virtue of his application for and receipt of various licenses and permits issued by public bodies). The “storm of controversy” cited by defendants blew up after the publication of the 1989 guide.[6] Indeed, many of the news stories reporting the heated debate over plaintiffs license application cited the 1989 Let’s Go entry as evidence that sexual harassment charges had been filed against plaintiff. Under the circumstances, the Court determines that plaintiff was dragged “unwillingly” into the controversy surrounding his operation of the IYH.
Similarly, there is no merit to defendants’ argument that plaintiff thrust himself into the controversy by virtue of his alleged sexual harassment of IYH guests. Plaintiff was never formally charged or convicted on any charges of sexual harassment and the mere fact that an individual is accused of criminal or otherwise inappropriate behavior does not automatically transform him or her into a limited purpose public figure. See Jones v. Taibbi, 400 Mass. at 798-99 (person questioned, but never charged, in serial murder investigation not limited purpose public figure because he was “dragged unwillingly” into the public controversy).
Having determined that plaintiff shall be accorded private figure status, it remains for a fact finder to decide whether defendants acted with “actual malice” when publishing the substantially true statement about plaintiff. To establish “actual malice,” as that term is used in §92, plaintiff need only prove “disinterested malevolence” rather than “knowing falsity” or “reckless disregard for the truth on the part of the defendants." Plaintiff asserts that Benor was motivated by revenge, arising from her unpleasant personal experience with plaintiff, and an intent to interfere with his business rather than a noble desire to warn tourists about the IYH. Plaintiff contends that Kurtzberg’s actions were likewise motivated by malice in that he fed off of Benor’s ill-will. It is for a fact finder to determine the intent motivating defendants’ statements.
3. Showing of Requisite Fault
Given the Court’s determination that plaintiff will be treated as a private figure and the determination that the statements complained of were substantially true, it is not necessary for the Court to address defendants’ argument on the issue of fault. However, even if the Court had held otherwise with respect to the above-referenced issues, defendants would still not be entitled to summary judgment. In cases involving public figures, plaintiff must prove, by clear and convincing evidence, that the alleged defamatory material was published with “actual malice”; in defamation cases, actual malice is proved by showing that defendant published the defamatory falsehood “with knowledge that it was false or in reckless disregard of whether it was false.” New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Stone v. Essex Cty. Newspapers, Inc., 367 Mass. 849, 867 (1975). There remain factual questions as to whether defendants acted with knowing falsity or reckless disregard for the truth. Specifically, the fact that Benor and Kurtzberg relied on information provided by plaintiffs competitors and did not independently confirm the truth of these allegations with the proper authorities might, in the eyes of a reasonable juror, constitute reckless disregard for the truth. Accordingly, defendants are not entitled to summary judgment on this ground.
4. Common Interest Privilege
Massachusetts recognizes a conditional privilege where the publisher and recipient have a common interest, and the publication is in furtherance of that interest. Foley v. Polaroid Corp., 400 Mass. 82, 95 (1987); Sheehan v. Tobin, 326 Mass. 185, 190-91 (1950). It is questionable whether the privilege is even relevant in this case given the Court’s determination that the complained of statement was substantially true. Assuming for argument’s sake that privilege is an issue, defendants would not be entitled to summary judgment. In order to deny defendant the protection of a conditional privilege, plaintiff must prove that the privilege was abused. Sullivan v. Birmingham, 11 Mass.App.Ct. 359, 365 (1981). One manner in which plaintiff may satisfy this burden is by showing that the statements were published by defendant with malice. *629 Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 342 (1943). Whether defendant was motivated by malice is a question of fact for the jury. See Bander, 313 Mass. at 343-44; Gassett v. Gilbert, 6 Gray 94, 98 (1856) (it is the exclusive province of the jury to pass upon the question of malice). Here, plaintiff claims that defendants abused the privilege in that they published the statement in an effort to harm plaintiffs business rather than warn Let’s Go readers about the IYH. This is a matter upon which reasonable jurors could differ and, as such, defendants are not entitled to summary judgment on this theory.
5. Issues for Trial
The Court’s determination that the allegedly defamatory statements were substantially true removes many of the factual questions from the case. All that remains for a fact finder to decide is whether defendants were motivated by disinterested malevolence in publishing the statements about plaintiff.
ORDER
For the foregoing reasons, plaintiffs Motion to Strike All or Portions of All Affidavits Offered in Support of Defendants’ Motion for Summary Judgment is ALLOWED with respect to the following: Lankenau Affidavit, Exhibit 10; Peretz Affidavit, Exhibits A and B; Elgrod Affidavit, Exhibit A; and Kohn Affidavit, Exhibit J. In all other respects, plaintiffs motion is DENIED.
Defendants’ Motion for Summary Judgment is DENIED.

The memorandum in support of the Motion to Strike is twenty-three pages in length and contains thirty separate arguments.

In addition to the Motion to Strike, plaintiff filed a (1) Motion to Strike Pleading as Scandalous, Immaterial or Impertinent, (2) Motion to Take Notice of Hague Convention Production Irregularities and Grant Appropriate Relief, and (3) Rule 56(g) Motion Seeking Relief for Defendants’ Submission of Exhibit and Pleadings in Bad Faith.

In his brief, plaintiff argues that since the statement allegedly submitted by Schoeman was not dated, it could not be confirmed that it was given in June or July of 1988. However, Schoeman testified in her deposition that she gave her statement sometime in June or July of 1988.

Plaintiff argues that this letter and the statements therein are inadmissible because they were made in an offer of settlement. This argument is without merit. At the time the letter was sent, there existed no suit to be settled. Furthermore, the letter was more in the nature of a demand rather than an offer of settlement.

Although plaintiff encountered community opposition to his operation of the IYH prior to the publication of the 1989 guide, the allegations of sexual harassment were not raised during these protests.