Bobby SEALE,

v.

GRAMERCY PICTURES, Polygram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., Tribeca Productions, Inc.

No. 95–CV–2174.

United States District Court, E.D. Pennsylvania.

May 15, 1997.

L. Glenn Scott, Philadelphia, PA, for plaintiff.

Stephen F. Huff, Tom J. Ferber, Pryor, Cashman,, Sherman & Flynn, New York City, Walter Weir, Jr., Jonathan J. Bart, Weir & Partners, Philadelphia, PA, for defendant.

### MEMORANDUM

RAYMOND J. BRODERICK, Senior District Judge.

The Plaintiff Bobby Seal brings this tort action seeking damages from the Defendants for the production, release, and distribution of the motion picture "Panther." The Defendants are Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. The Plaintiff contends that the Defendants' portrayal of him in the film "Panther" (by use of an actor called "Bobby Seale" in the film) places him in a "false light" in violation of his common law right of privacy.

The film integrates actors playing fictitious characters with actors playing the roles of the real-life leaders of the "Black Panther

Party," an organization which was formed in Oakland, California in 1966. The Plaintiff Bobby Seale was the co-founder of the Black Panther Party.

A bench trial was held before the court on March 4, 1997 and it concluded on March 11, 1997. For the reasons stated hereinafter, which are Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a), judgment will be entered in favor of Defendants against Plaintiff Bobby Seale.

### The Uncontested Factual Background

In 1966 the Plaintiff Bobby Seale along with another young black male named Huey P. Newton formed a "grass-roots" political/social organization in the black community of Oakland, California. They named the organization the "Black Panther Party for Self–Defense," but later shortened the name to the "Black Panther Party" in an effort to portray the party as a true political organization and not as a paramilitary organization. Bobby Seale took the title of the Party's Chairman and Huey P. Newton took the title of the Party's Minister of Defense. One of the Party's first members was a teenager named "Little" Bobby Hutton. A local Californian named Eldridge Cleaver later joined the Party and took the title of the Party's Minister of Information, making him the Party's third highest ranking leader behind Seale and Newton.

Bobby Seale and Huey Newton set forth the platform of the Black Panther Party in a "Ten–Point Program." The Party's Ten–Point Program provided:

WHAT WE WANT NOW!:

1. WE WANT FREEDOM, WE WANT POWER TO DETERMINE THE DESTINY OF OUR BLACK COMMUNITY.

2. WE WANT FULL EMPLOYMENT FOR OUR PEOPLE.

3. WE WANT AN END TO THE ROBBERY BY THE WHITE MAN OF OUR BLACK COMMUNITY.

4. WE WANT DECENT HOUSING FIT FOR SHELTER OF HUMAN BEINGS.

5. WE WANT EDUCATION FOR OUR PEOPLE THAT EXPOSES THE TRUE NATURE OF THIS DECADENT AMERICAN SOCIETY. WE WANT EDUCATION THAT TEACHES U.S. OUR HISTORY AND OUR ROLE IN THE PRESENT DAY SOCIETY.

6. WE WANT ALL BLACK MEN TO BE EXEMPT FROM MILITARY SERVICE.

7. WE WANT AN IMMEDIATE END TO POLICE BRUTALITY AND MURDER OF BLACK PEOPLE.

8. WE WANT FREEDOM FOR ALL BLACK MEN AND WOMEN HELD IN FEDERAL, STATE, COUNTY, AND CITY PRISONS AND JAILS.

9. WE WANT ALL BLACK PEOPLE WHEN BROUGHT TO TRIAL, TO BE TRIED IN COURT BY A JURY OF THEIR PEER GROUP OR PEOPLE FROM THEIR BLACK COMMUNITIES, AS DEFINED BY THE CONSTITUTION OF THE UNITED STATES.

10. WE WANT LAND, BREAD, HOUSING, EDUCATION, CLOTHING, JUSTICE AND PEACE.

In order to effectuate its goals, the Party implemented a number of "community survival programs." For example, the Party started a free breakfast program for neighborhood children, a program to test black residents for sickle-cell anemia, and a senior citizens safety program to escort the elderly to local banks and supermarkets. The Party was also involved in educating Oakland's black residents on issues relating to voter registration and legal aid services.

As heretofore pointed out, the Party's Ten–Point Program called for "an immediate end to police brutality and murder of black people." The Party encouraged Oakland's black residents to purchase guns in order to stem what the Party considered to be excessive brutality and racism on the part of the Oakland police. In the Party's litany of beliefs, it was stated:

WE BELIEVE WE CAN END POLICE BRUTALITY IN OUR BLACK COMMU-

NITY BY ORGANIZING BLACK *SELF DEFENSE* GROUPS THAT ARE DEDICATED TO DEFENDING OUR BLACK COMMUNITY FROM RACIST POLICE OPPRESSION AND BRUTALITY. THE SECOND AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES GIVES U.S. A RIGHT TO BEAR ARMS. WE THEREFORE BELIEVE THAT ALL BLACK PEOPLE SHOULD ARM THEMSELVES FOR *SELF DEFENSE*.

Members of the Black Panther Party openly carried guns in public. The evidence presented at the trial showed that some of the guns which Bobby Seale and Huey Newton first collected were given to them by a Black Panther Party sympathizer named Richard Aoki. Most of the Party's guns, however, were purchased by Seale and Newton at local hardware stores in Oakland and San Francisco.

In an attempt to stem what the Party considered to be excessive brutality and racism on the part of the Oakland police, the Party implemented a program to "patrol" the Oakland police department. The Black Panther Party patrols consisted of several armed Party members following and observing the Oakland police carrying out their duties. The Party members were dressed in the Black Panther Party uniform, which consisted of a black leather jacket, black pants, a blue turtle-neck shirt, and a black beret. At trial, Bobby Seale acknowledged during his testimony that the Party's broader aim in conducting the police patrols was "[t]o capture the imagination of [the] people so we could better organize them and organize what I call unifying the black community vote."

Huey Newton was in law school at the time he co-founded the Black Panther Party and, according to the testimony of Bobby Seale, Newton carefully ensured that the Party's operations and tactics were in strict compliance with the law. For example, in 1966 Newton advised all members of the Party that under California law it was legal to carry a gun in public, so long as the gun was not concealed or pointed at another person. Accordingly, Newton mandated that Party members on patrol must never point their guns at a police officer.

By 1968 a difference of opinion emerged among the Party's top three leaders over what role violence should play in the Black Panther Party's actions following the assassination of Martin Luther King, Jr. on April 4, 1968. Bobby Seale and Huey Newton continued to adhere to the established Black Panther Party position that members should only use violence as a means of self-defense and should not instigate violence against anyone, including the police. Eldridge Cleaver, however, advocated that the time had come for Party members to engage in armed combat with the police by initiating violence against the police.

The schism in the leaders' beliefs on the propriety of initiating violence against the police manifested itself in the days immediately following Martin Luther King, Jr.'s assassination. Two days after King's death, several members of the Black Panther Party, including Eldridge Cleaver and Little Bobby Hutton, engaged in a shoot-out with the police. Little Bobby Hutton was killed and Eldridge Cleaver was wounded. Neither Bobby Seale nor Huey Newton was involved in the shoot-out.

The day after Eldridge Cleaver's shoot-out with the police, Bobby Seale led a Black Panther Party rally at a local park where he stated that both he and Huey Newton continued to adhere to the established Party policy which denounced the initiation of violence against the police and denounced acts of rioting. Seale continued to maintain, however, that Party members should own guns for self-defense. Testimony was presented at trial that, to this day, many people credit Bobby Seale with maintaining the peace in Oakland's black community in the days of unrest which followed Martin Luther King, Jr.'s assassination.

Bobby Seale testified that following the death of Martin Luther King, Jr., the membership of the Black Panther Party continued to increase due to his efforts to organize local chapters and branches of the Black Panther Party throughout the country. According to Seale's account, the membership of the Black

Panther Party grew nationwide to over five-thousand members.

Bobby Seale resigned from the Black Panther Party in 1974. He has written two books dealing with his involvement in the Black Panther Party: *Seize the Time: The Story of the Black Panther Party and Huey P. Newton* and A *Lonely Rage* (his autobiography). He currently lives in the Philadelphia area and derives the majority of his income from lecturing at colleges and universities on the topic of the Black Panther Party. He has formed a production company named "REACH Cinema" and is in the process of raising money to produce a documentary film on the Black Panther Party. Bobby Seale testified that several years ago he appeared in commercial advertisements for a well-known brand of ice-cream and for a local bank.

The issues in this case concern the motion picture "Panther," which was released in May 1995 by Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. The screenplay for the film was written by filmmaker Melvin Van Peebles and is based on his novel of the same title. Melvin Van Peebles and his son Mario Van Peebles produced the film, and they chose Preston Holmes to assist them in the film's production.

The film's producers retained the services of two consultants to work on the film—J. Tarika Lewis and Ula Taylor, Ph.D. Ms. Lewis was the first woman to join the Black Panther Party and continues to reside in the Oakland area. Dr. Taylor is an Assistant Professor of African–American Studies at the University of California at Berkeley and teaches courses dealing with the history of the Black Panther Party. Ms. Lewis and Dr. Taylor were retained by the film's producers for the purpose of ascertaining that certain scenes in the film accurately portrayed the Black Panther Party and its leaders. Both Ms. Lewis and Dr. Taylor testified at trial as defense witnesses.

The film "Panther" integrates actors playing the roles of fictitious characters with actors playing the roles of the true leaders of the Black Panther Party. The narrator of the film is a fictitious character named "Judge," who chronicles for the audience his involvement in the Black Panther Party in Oakland, California during the late 1960's. In the film's opening scene, the audience hears the voice of the "Judge" character state:

> The Black Panthers. The people still ask me how it all started. How things went so far. Like a lot of questions about the Panthers, there are different answers, different beginnings.

The role of Bobby Seale is played by actor Courtney B. Vance. The role of Huey Newton is played by actor Marcus Chong. The role of Eldridge Cleaver is played by actor Anthony Griffith.

Throughout the film, the fictitious character "Judge" interacts with the actors playing the roles of the Black Panther Party leaders Seale, Newton, and Cleaver. The film reenacts several historically documented events of the Black Panther Party, such as the Black Panther Party's May 1967 protest march onto the floor of the California State Legislature and Huey Newton's October 1967 shoot-out with an Oakland police officer, in which the officer was killed and Newton was subsequently jailed.

*Discussion of the Law Re: Bobby Seale's False Light Claims*

The Plaintiff Bobby Seale contends that the Defendants' portrayal of him in "Panther" (by use of an actor called "Bobby Seale" in the film) places him in a "false light" in violation of his common law right of privacy.

The Parties do not dispute that the Plaintiff is a well-known public figure in connection with his activities as the co-founder and Chairman of the Black Panther Party. As the Third Circuit recognized in *Marcone v. Penthouse Intern. Magazine for Men,* 754 F.2d 1072, 1083 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985), "[i]f a position itself is so prominent that its occupant unavoidably enters the limelight, then a person who voluntarily assumes such a position may be presumed to have accepted public figure status." The Plaintiff's name and role in the Black Pan-

ther Party may be found in historical text-books dealing with the Civil Rights Movement. *See, e.g.,* John Hope Franklin & Alfred A. Moss, Jr. *From Slavery to Freedom: A History of Africans Americans* at 518–21 (7th ed.1994). Moreover, the Plaintiff presently lectures at colleges and universities throughout the country on the topic of the Black Panther Party and holds himself out to the public on his Internet Web–Site as: "Bobby Seale—The Revolutionary Humanist."

The Defendant's expert, film maker Robert Burger, testified that the film "Panther" is best categorized under the film genre of "docudrama." He testified that the "key" to making a docudrama is to capture the "essence" of an historical event and not necessarily to recreate for the audience every historical detail of that event. Mr. Burger testified that such major motion pictures as "Ghandi" and "JFK" are appropriately classified as docudramas. The Plaintiff's expert Warren Bass, Ph.D, a Professor of Film and Media Arts at Temple University, likewise testified that the film "Panther" is a "docudrama."

The court finds that the film "Panther" is a "docudrama" and not a "documentary" film. A docudrama is a "motion picture presenting a dramatic recreation or adaptation of actual events." J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 8.9[A] n. 2 (insert 6/96) (citation omitted). It "is a dramatization of an historical event or lives of real people, using actors or actresses. Docudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes." *Davis v. Costa–Gavras,* 654 F.Supp. 653, 658 (S.D.N.Y.1987). By contrast, a documentary film "is a non-fictional story or series of historical events portrayed in their actual location; a film of real people and real events as they occur. A documentary maintains strict fidelity to fact." *Id.*

As heretofore stated, the film "Panther" does not purport to maintain strict fidelity to fact; it integrates fictitious characters with actors portraying the roles of the real-life leaders of the Black Panther Party. "Panther" primarily represents a work of enter-tainment as opposed to a fact-specific historical account of events. The film "Panther" is a "docudrama."

■ The Plaintiff Bobby Seale's "false light" invasion of privacy claims are based on the Defendants' portrayal in "Panther" of Bobby Seale's public activities as the co-founder and Chairman of the Black Panther Party during the late 1960's. The film does not portray the private activities of Bobby Seale, and he has not alleged a cause of action for the publication of matters concerning his private affairs. Accordingly, it is worth noting that, "[t]hose who are voluntarily in the public eye, such as celebrities and politicians, clearly have less 'privacy' than others, at least as to legitimate reporting of facts reasonably relevant to their public activities." J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 5.9[B][l] (insert 3/96).

■ The Plaintiff's false light claim is recognized under Pennsylvania law as a distinct cause of action for the invasion of privacy pursuant § 652E of the Restatement (Second) of Torts. *See Larsen v. Philadelphia Newspapers, Inc.,* 375 Pa.Super. 66, 543 A.2d 1181 (en banc), *allocatur denied,* 520 Pa. 597, 552 A.2d 251 (1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989). The Restatement (Second) of Torts provides:

§ 652E. Publicity Placing Person in False Light

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Comment c to § 652E provides some guidance as to the parameters of the false light invasion of privacy violation. Comment c states:

The plaintiff's privacy is not invaded when the unimportant false statements are made, even when they are made deliberately. It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy.

Restatement (Second) of Torts § 652E cmt. c (1977).

■ Moreover, Comment d to § 652E makes clear that the false light tort incorporates the First Amendment's constitutional protections set forth in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. A public figure cannot recover for a false light claim,

unless he proves by clear and convincing evidence that the defendant published the [false portrayal] with actual malice, i.e., with 'knowledge that it was false or with reckless disregard of whether it was false or not.' Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author 'in fact entertained serious doubts as to the truth of his publication' or acted with a 'high degree of awareness of ... [its] falsity.'

*Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) (citations omitted).

### Issues and Findings of Fact Re: Bobby Seale's False Light Claims

In this case, the Plaintiff Bobby Seale contends that two scenes in the film "Panther" portray him in a false light. The first scene to which Bobby Seale objects is the scene in which the actors who play the roles of Bobby Seale and Huey Newton, accompanied by the actors who play the roles of the fictitious characters "Judge" and "Tyrone," are shown in a closed room engaging in the purchase of guns from an Asian gun dealer. The court will hereinafter refer to this scene as the "Gun–Purchasing" scene. The second scene to which Bobby Seale objects is the scene in which the actors who play the roles of Bobby Seale and Eldridge Cleaver engage in a verbal confrontation, in the presence of other armed Party members and Little Bobby Hutton, over the role that violence should play in the Party's activities following the assassination of Martin Luther King, Jr. The court will hereinafter refer to this scene as the "Seale–Cleaver Confrontation" scene.

The Plaintiff Bobby Seale contends that the Gun–Purchasing scene portrays him in a false light. The scene is set in a closed room with no windows and depicts the character who plays Bobby Seale, along with other Party members, engaging in the purchase of guns from an Asian gun dealer. The following dialogue takes place during the Gun–Purchasing scene:

JUDGE: It's a busted firing pin. You want only the legal stuff right, right brother?

TYRONE: Yeah, just the legit stuff.

GUN

DEALER: Nothing wrong with that pistol. JUDGE: The serial number's been filed, man. Cop catches you with this he has an excuse to say you either stole it or 'offed' somebody with it.

GUN

DEALER: I don't want no trouble. No cops coming to me about these guns.

NEWTON: No trouble here. You got a permit to sell, we got cash. All perfectly legal.

GUN

DEALER: These are worth a lot more.

SEALE: I thought you were a revolutionary, man. Look, we can't afford 'em unless you cut us some slack. But, you treat us right, we'll be doing a lot of business.... All right? ... Wonderful.

GUN

DEALER: Thank you.

SEALE: That's it. Let's go.

The Plaintiff Bobby Seale contends that the Gun–Purchasing scene places him in a false light in that the scene falsely depicts him and other Party members engaging in the purchase of illegal guns. At trial, Bobby Seale testified: "This film 'Panther' does not represent what my organization is about, and

to falsely portray me . . . in some back room somewhere as though we're buying illegal guns, it was sunny California. We were not in a dark room. We went to a department store to buy the guns." Further, Bobby Seale testified: "I mean, we didn't purchase guns like that. The type of organization we had, we knew from Jump Street that every gun had to always be legal and based on the fact that Huey did all this research on the gun laws in California at the time, we knew the laws backward, forward, sideways and catty-corner. . . ."

■ The court finds that the Defendants' portrayal of Bobby Seale in the Gun–Purchasing scene does not portray him in a false light. The scene does not portray Bobby Seale engaging in the purchase of illegal guns. To the contrary, the scene portrays Bobby Seale engaging in the purchase of legal guns. It portrays the Party members stating to the gun dealer that they are only interested in purchasing legal guns. Indeed, the actor playing the role of Huey Newton clearly states: "All perfectly legal." The scene also refers to the fact that the Party members were aware that the gun dealer had a permit to sell guns.

Moreover, the substance of the film's Gun–Purchasing scene is a substantially accurate account of the Black Panther Party activities, as evidenced by the Plaintiff's own trial testimony as well as his own book on the subject, *Seize the Time.* Bobby Seale testified at trial that in the early days of the Party he and Huey Newton were given guns by Richard Aoki, a Black Panther Party sympathizer who was of Japanese ancestry. At trial, Bobby Seale read the following passage from his book *Seize the Time:*

> Our first weapons, late in November 1966, we went to a Third World brother we knew, a Japanese radical cat. . . . We told him that we wanted these guns to begin to institutionalize and let black people know we have to defend ourselves as Malcolm X said we must. We didn't have any money to buy guns. We told him that if he was a real revolutionary held better go on and give them up to us because we needed them now to begin educating the people to

wage a revolutionary struggle. So he gave us an M–1 and a 9 mm.

Moreover, Bobby Seale testified at trial that he and Huey Newton eventually raised money to purchase guns from local department stores in Oakland and San Francisco. Bobby Seale again read a passage from his book *Seize the Time:*

> Huey said, 'let's go buy some shotguns,' so we went to the B.B.B. department store . . . We walked up to the counter and were paying for the shotgun after we requested it from the back counter where the sports material was located. We were drunk admiring those pistols, shotguns, rifles, what have you. And the woman at the counter says, and you could tell she was lying, 'You know, these FBI men have been coming around to request information and names on everyone who buys a gun in our store.' Huey says, 'We don't care. That don't make any difference. There is my money. I'm Huey P. Newton of the Black Panther Party. Here's my money. I want my shotgun.'

The court finds that the Plaintiff's objections to the Gun–Purchasing scene are limited to pointing out minor factual inaccuracies in the scene. For example, Bobby Seale testified that he never *purchased* guns from Richard Aoki, but that Richard Aoki *gave* him guns. He further testified that he never purchased guns in a dark room, but purchased guns in hardware stores during normal business hours. The court finds, however, that when viewed in the context of the film, the Gun–Purchasing scene does not portray Bobby Seale in a false light; it does not portray Bobby Seale and the Black Panther Party members engaging in the purchase of illegal guns. As pointed out by the United States Supreme Court in a similar invasion of privacy case: "Minor inaccuracies do not amount to falsity. . . ." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 516, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (citation omitted).

Accordingly, after reviewing the "Gun–Purchasing" scene and the dialogue in the scene, the court finds that the Plaintiff Bobby Seale has failed to show that the "Gun–Purchasing" scene portrays him in "a false

light" which "would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652E.

The court has also reviewed the "Seale–Cleaver Confrontation" scene in which the actors who play the roles of Bobby Seale and Eldridge Cleaver engage in a verbal argument, in the presence of other armed Party members and Little Bobby Hutton. The scene depicts Eldridge Cleaver stating, soon after hearing the news of the assassination of Martin Luther King, Jr., that it was time for the Black Panther Party to initiate violence against the police. Bobby Seale is shown expressing his disagreement with Eldridge Cleaver's position on the initiation of violence against the police. The scene concludes with Eldridge Cleaver leaving the meeting with several armed Party members and Little Bobby Hutton.

The following dialogue takes place during the "Seale–Cleaver Confrontation" scene:

CLEAVER: No, No, No, No more words. No more words. No more sitting, no more praying, waiting for the pigs to kill us. Later for lying down. Later for waiting to get shot like dogs. Non-violence died in Memphis, died with Dr. King. Now, now we got the fucking guns, it's time to use them.

\* \* \* \* \* \*

SEALE: Brother Eldridge, I hear you. But I disagree. And we both know Huey disagrees too. Yeah, we got guns, but the pigs got more guns, the pig has got the National Guard. Now I ain't afraid to fight, but we ain't stupid either. This here is a time to be smart Brother Eldridge.

CLEAVER: Later for all that. . . .

SEALE: No later for you.

TYRONE: Now listen up man, what are we going to forget about Huey and his trial? Start killing pigs? Start the revolution now? With one of our leaders in jail.

CLEAVER: Yea.

TYRONE: Man if we do that, Huey is a dead man. We're all dead. No man we stay cool. . . .

CLEAVER: Later for that. It is time to intensify the struggle. That's what it is!

The Plaintiff Bobby Seale contends that the "Seale–Clever Confrontation" scene portrays him in a false light. He contends that he never had a argument with Eldridge Cleaver in the days following the assassination of Martin Luther King, Jr. Bobby Seale also contends that the scene falsely depicts him as losing his control and leadership of the Black Panther Party to Eldridge Cleaver. At trial, Bobby Seale testified: "This film 'Panther' does not represent what my organization is about, and to falsely portray me sitting up there arguing with Eldridge Cleaver to usurp my authority, that's wrong." Bobby Seale also contends that the scene falsely depicts his relationship with Little Bobby Hutton in that the scene shows Little Bobby Hutton rejecting his guidance by leaving the confrontation with Eldridge Cleaver. At trial, the Plaintiff testified: "I mean, because for them to portray Lil' Bobby ignoring me, who I was too close to him for him to do that. Lil' Bobby would do what I said to, when I say to, because he knew that I dealt with him for the best of his interest in any kind of situation."

At trial, the Plaintiff's expert Warren Bass, Ph.D., a Professor of Film and Media Arts at Temple University, testified concerning the Seale–Cleaver Confrontation scene as follows:

It [the scene] says that there was a confrontation for leadership at that moment. It says that Bobby Seale gives, gives in and doesn't stop it. I also have written out my copy of the dialogue of that scene. It says in particular that they are talking about going out and confronting with guns police, and that Bobby Seale is present and aware of that. And in the scene that follows, it says pretty much that where Huey asked, we must stay disciplined this latest plan is counter-revolutionary, you must stop Eldridge which also implies even the existence of the previous scene that there is a plan, there is something that needs to be stopped and there is something that Bobby Seale is aware of, Bobby Seale's answer is, outrage is outrage. In other words, he is going to let this hap-

pen.... Well, as a crisis scene at a key point in the film, it looks as if it is there to heighten the melodrama. .Instead of this event happening without the protagonist's knowledge, it happens as a direct confrontation, and it seems to me that confrontation is a very troublesome misrepresentation of history if these are not events that occurred.

The Seale–Cleaver Confrontation scene provides the false impression that following the assassination of Martin Luther King, Jr. in 1968, Bobby Seale lost his control and leadership of the Black Panther Party to Eldridge Cleaver. The scene falsely depicts the Black Panther Party membership, including Little Bobby Hutton, rejecting Bobby Seale's leadership by following Eldridge Cleaver's call for the initiation of violence against the police.

The scene does not set forth Bobby Seale's position as an advocate of non-violence against the police. At trial, Bobby Seale adamantly stated on several occasions that although he believed that Party members should arm themselves, he did not advocate the initiation of violence against anyone, including the police. His position was that violence should only be used as a means of self-defense. When asked about his policy and the Party's policy concerning the initiation of violence against the police after Martin Luther King, Jr.'s assassination, the Plaintiff testified:

> The policy was just the opposite of that. I was director, and at the helm of the Party while Huey was in jail, and the basic policy standard then was that we did not attack anybody. Now, we would make preparations to defend ourselves. That's two different kinds of situations. If attacked, we would make preparation to defend ourselves, but you had no policy that you had a right to go out and attack any police or any individual at all. You couldn't do it.

As the court has heretofore pointed out, the Seale–Cleaver Confrontation scene does not set forth Bobby Seale's position as an advocate of non-violence against the police. On April 7, 1968, the day following Eldridge Cleaver's shoot-out with the police, Bobby Seale led a Black Panther Party rally at a local park where he stated that both he and Huey Newton continued to adhere to the established Party policy which denounced the initiation of violence against the police and denounced acts of rioting. Testimony was presented at trial that, to this day, many people credit Bobby Seale with maintaining the peace in Oakland's black community in the days of unrest which followed Martin Luther King, Jr.'s assassination.

The film's producer Melvin Van Peebles testified that his purpose in composing the Seale–Cleaver Confrontation scene was to have the scene serve as a "dramatization of the[e] schism" between Seale and Cleaver and that his intention was to show that it was Bobby Seale's "ability to stand for a firm strategic position, rather than a short tactical one, that finally won the day and saved Oakland."

However, nowhere in the film "Panther" is there a scene portraying Bobby Seale leading a rally after the assassination of Martin Luther King, Jr. and after Eldridge Cleaver's shoot-out with the police. The film producers' own consultant J. Tarika Lewis, who was called as a defense witness at trial, testified that it was Bobby Seale's leadership at the April 7, 1968 rally and his call for peace that prevented rioting from breaking out in Oakland. Ms. Lewis commented on Bobby Seale's leadership at the rally as follows:

> I thought that he [Bobby Seale] was—it was a magnificent display of what he said at the rally. Oakland could have been turned upside down and, in spite of what happened the night before with Eldridge and Lil Bobby getting murdered, he told people to remain calm, that we best organize our community. We defend ourselves, that everybody should have a shotgun in their home, that you should defend your home, but we would not go out and be emotional and attack anyone.

In producing the film "Panther," the Defendants neglected to portray Bobby Seale in perhaps his finest hour—leading the April 7, 1968 Black Panther Party rally in which he called for non-violence and peace in the aftermath of the assassination of Martin Luther

King, Jr. and the shooting death of his protege Little Bobby Hutton by the police.

■ The court finds that the Defendants' portrayal of Bobby Seale in the Seale–Cleaver Confrontation scene, as well as the Defendants' failure to include in the film a portrayal of Bobby Seale's leadership at the April 7, 1968 rally where he urged the Black Panther Party members to return to their homes and to only use their guns in self-defense, does not depict Bobby Seale in the light he deserved. It depicts him in a false light.

However, as heretofore pointed out, Comment d to § 652E of the Restatement (Second) of Torts makes clear that the false light tort incorporates the First Amendment's constitutional protections set forth in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. A public figure cannot recover for a false light claim, "unless he proves by clear and convincing evidence that the defendant published [the false portrayal] with actual malice, *i.e.,* with 'knowledge that it was false or with reckless disregard of whether it was false or not.' Mere negligence does not suffice." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) (citation omitted).

The record in this case is devoid of clear and convincing evidence that the Defendants acted with malice. The record is devoid of clear and convincing evidence that the Defendants acted with reckless disregard as to whether their portrayal of Bobby Seale was false or not. As pointed out by the distinguished jurist Senior Judge Milton Pollack in *Davis v. Costa–Gavras,* 654 F.Supp. 653, 658 (S.D.N.Y.1987): "In docudrama, minor fictionalization cannot be considered evidence or support for the requirement of actual malice.... The cases on point demonstrate that the First Amendment protects such dramatizations and does not demand literal truth in every episode depicted; publishing a dramatization is not of itself evidence of actual malice."

The evidence presented at trial by the Defendants demonstrates that they undertook substantial efforts to ensure the historical accuracy of the film's depiction of Bobby Seale. The Defendants retained the services of two consultants to work on the film's production—Tarika Lewis, who was the first woman to join the Black Panther Party and Ula Taylor, Ph.D, who is an Assistant Professor of African–American Studies at the University of California at Berkeley.

Professor Taylor testified that in verifying the historical accuracy of the Seale–Cleaver Confrontation scene, she consulted numerous books on the topic of the Black Panther Party written by former Party members. For example, she consulted the Plaintiff's own book *Seize the Time,* Huey Newton's book *Revolutionary Suicide,* as well as the book *This Side of Glory: The Autobiography of David Hillard and the Story of the Black Panther Party.* Dr. Taylor also testified that she reviewed newspaper articles which reported the activities of the Black Panther Party following the assassination of Martin Luther King, Jr. Dr. Taylor provided the film's producers with an "Annotated Historical Documentation" in which she verified the historical accuracy of certain scenes in the film, including the Seale–Cleaver Confrontation scene, by making annotated references to various books on the Black Panther Party which in her opinion supported the historical accuracy of the scenes.

Indeed, the film's screenwriter and co-producer Melvin Van Peebles testified that he was and continues to be a sympathizer and admirer of the Black Panther Party. He testified that he and his son Mario chose Preston Holmes to assist them in producing the film because, "[h]e was also a sympathizer for the Panther Party. He also respected it, and wanted them to be shown in the stronger—the best light possible."

With regard to the Seale–Cleaver Confrontation scene, Melvin Van Peebles acknowledged at trial that when he wrote that particular scene he had no knowledge that Bobby Seale and Eldridge Cleaver ever engaged in a face-to-face argument after the assassination of Martin Luther King, Jr. Melvin Van Peebles testified, however, that his purpose in composing the Seale–Cleaver Confrontation scene was to have the scene serve as a "dramatization of th[e] schism" between Seale and Cleaver. His intention was to show

that it was Bobby Seale's "ability to stand for a firm strategic position, rather than a short tactical one, that finally won the day and saved Oakland." The court finds that the Plaintiff Bobby Seale has failed to carry his burden of proving by clear and convincing evidence that the Defendants' false portrayal of him was done with actual malice; that is, with knowledge that it was false or with reckless disregard as to whether it was false or not.

Accordingly, for the reasons heretofore stated, the court will enter judgment in favor of Defendants against Plaintiff Bobby Seale as to his false light invasion of privacy claims.

### Bobby Seale's Contract with Warner Brothers, Inc.

At trial there was considerable testimony presented concerning a contract option which Bobby Seale had received from Warner Brothers, Inc. in connection with Warner Bothers' plans to retain Bobby Seale as a consultant in the event Warner Brothers decided to produce a film about the Black Panther Party. The court finds, however, that there was no legal basis for claiming that the Defendants in this case are liable for the tortious interference with the Plaintiff's Warner Brothers contract option. As a matter of fact, the Plaintiff alleged no such claim for the tortious interference of contract in his complaint.

### Issues and Findings of Fact Re: Bobby Seale's Right of Publicity and Lanham Act Claims

The Plaintiff also seeks damages from the Defendants for their unauthorized use of his likeness in two photographs of the actor who played the role of Bobby Seale in the film. These photographs appear on the brochure enclosed with the musical compact-disc (CD) soundtrack to the film. The Plaintiff contends that the unauthorized use of his likeness in the two photographs appearing on the brochure to the musical CD soundtrack violates his common law right of publicity and also constitutes false advertising in violation of § 43(a) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a).

The sound-track for the film "Panther" has been released on compact-disc (CD). At trial the Plaintiff submitted in evidence a copy of the film's musical CD soundtrack enclosed in its packaging box with brochure. The CD contains a collection of the songs played throughout the film. It consists of various songs composed by different musicians and includes the song "Express Yourself" by "JOE" and the song "We'll Meet Again" by "Blackstreet."

The brochure enclosed in the CD's plastic packaging box contains two photographs, each less than an inch in diameter, of several actors who played Black Panther Party members in the film. The first photograph depicts seven actors dressed in the Black Panther Party uniform, including the actor who plays the role of Bobby Seale. The second photograph depicts the scene in the film where the actor who played the role of Bobby Seale, dressed in the Black Panther Party uniform, walked onto the floor of the California State Legislature.

Bobby Seale testified that he never gave the Defendants permission to use his likeness on the brochure to the CD. Moreover, he testified that he was familiar with the songs in the CD and the "content" of the songs, and he testified that "[t]here is no relationship to the content of those songs to the history of my organization, the Black Panther Party."

The court has not found, nor have the parties brought to the court's attention, any Pennsylvania case law which clearly sets forth the elements for a right of publicity claim in Pennsylvania. However, the court predicts that the Pennsylvania Supreme Court will clarify the law concerning the right of publicity in Pennsylvania by adopting the Restatement (Third) of Unfair Competition, which was recently published by the American Law Institute in 1995. Section 46 defines the right of publicity as follows:

§ 46 Appropriation of the Commercial Value of a Person's Identity: the Right of Publicity

One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for the purposes of

trade is subject to liability for the relief appropriate under the rules stated in §§ 48 and 49.

As stated in § 46, liability for the infringement of the right of publicity is limited to use of another's "name, likeness, or other indicia of identity for the purposes of trade." Section 47 of the Restatement defines the term "for the purposes of trade" as follows:

§ 47 Use for Purposes of Trade

The name, likeness, and other indicia of a person's identity are used "for the purposes of trade" under the rule stated in § 46 if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user. . . .

■ The court finds that the Plaintiff Bobby Seale has failed to present evidence sufficient to show by a preponderance of the evidence that the Defendants' use of the two photographs of the actor who played the role of Bobby Seale in the film was "for the purposes of trade" or for "a commercial purpose." Comment c to § 47 of the Restatement states that liability for infringement of the right of publicity may be found "if the name or likeness is used solely to attract attention to a work that is not related to the identified person. . . . " Bobby Seale presented no such evidence. The court finds that the Plaintiff Bobby Seale has failed to show that the use of his likeness on the inside of the CD brochure, two photographs of the actor who played Bobby Seale in the film dressed in the Black Panther Party uniform, violated his right of publicity.

Accordingly, the court will enter judgment in favor of Defendants against Plaintiff Bobby Seale as to his right of publicity claim.

Bobby Seale has also set forth a false advertising claim under § 43(a) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a). He contends that the Defendants' use of his likeness in the CD brochure, the two photographs of the actor who played Bobby Seale in the film dressed in the Black Panther Party uniform, constitutes false advertising in that the Defendants' use of his likeness falsely implies that he endorses, approves, or is affiliated with the musical CD soundtrack.

■ The federal basis for a private cause of action for false advertising is § 43(a) of the Lanham Act, which provides:

False designations of origin, false descriptions, and dilution forbidden

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

A claim for false advertising under the Lanham Act,

requires that [a] plaintiff prove two discrete elements: (1) the context of the use contains a message of the plaintiff's endorsement, approval or affiliation; and (2) that [the] message is false or misleading. If the defendant's use does not on its face contain a clear message of endorsement, [the] plaintiff must produce evidence, usually in the form of market research or consumer surveys, showing exactly what message customers received from [the] defendant's ad. Once that message is ascertained, plaintiff must then prove the second element, that [the] message is false or misleading.

J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 5.4[B][2] (insert 3/96). In other words, "it is necessary to prove that the buying public was actually deceived in order to recover damages under § 43(a) of

the Lanham Act." *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981).

 The Defendant's use of Plaintiff Bobby Seale's likeness on the inside of the CD brochure contains no written message that Bobby Seale endorses, approves, or is otherwise affiliated with the musical CD. Moreover, at trial Bobby Seale failed to present evidence tending to show that the Defendants' use of his likeness in the brochure implies to the consumer public that he endorses, approves, or is otherwise affiliated with the musical CD. Nor did Bobby Seale present evidence tending to show that the consumer public "was actually deceived" into believing that he endorses, approves, or is affiliated with the musical CD. The court finds that the Plaintiff Bobby Seale has failed to show that the Defendants' use of his likeness on the inside of the CD brochure, two photographs of the actor who played Bobby Seale in the film, constitutes false advertising under § 43(a) of the Lanham Act.

Accordingly, the court will enter judgment in favor of Defendants against Plaintiff Bobby Seale as to his false advertising claim.

### Conclusion

For the reasons heretofore stated, the court will enter judgment in favor of Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. against Plaintiff Bobby Seale as to his false light invasion of privacy claims concerning the film "Panther." The court will also enter judgment in favor of Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. against Plaintiff Bobby Seale as to his right of publicity claim concerning the brochure to the musical CD soundtrack to the film "Panther." The court will also enter judgment in favor of Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. against Plaintiff Bobby Seale as to his false advertising claim concerning the brochure to the musical CD soundtrack to the film "Panther."

### ORDER

AND NOW, this 15th day of May 1997; for the reasons stated in this court's memorandum of May 15th, 1997;

IT IS ORDERED: Judgement is hereby entered in favor of Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. against Plaintiff Bobby Seale as to his false light invasion of privacy claims concerning the film "Panther";

IT IS FURTHER ORDERED: Judgement is hereby entered in favor of Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. against Plaintiff Bobby Seale as to his right of publicity claim concerning the brochure to the musical CD soundtrack to the film "Panther";

IT IS FURTHER ORDERED: Judgement is hereby entered in favor of Defendants Gramercy Pictures, PolyGram Filmed Entertainment Distribution, Inc., Working Title Group, Inc., and Tribeca Productions, Inc. against Plaintiff Bobby Seale as to his false advertising claim concerning the brochure to the musical CD soundtrack to the film "Panther."